IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


JONES V. JONES


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


MARY A. JONES, APPELLANT,

V.

CURTIS L. JONES, APPELLEE.


Filed February 5, 2019.   No. A-18-093.


Appeal from the District Court for Lancaster County: ANDREW R. JACOBSEN, Judge. Affirmed in part, and in part reversed and remanded with directions.

David V. Chipman, of Monzón, Guerra & Associates, for appellant.

Mark J. Krieger and Terri M. Weeks, of Bowman & Krieger Law Firm, for appellee.


MOORE, Chief Judge, and RIEDMANN, and WELCH, Judges.

MOORE, Chief Judge.

## I. INTRODUCTION

Mary A. Jones appeals from an order of modification entered by the district court for Lancaster County awarding her former husband, Curtis L. Jones, sole physical custody of their son and final decisionmaking authority over him. The court also denied Mary's request to increase Curtis' child support obligation, and instead ordered Mary to pay Curtis a nominal amount of child support. For the reasons set forth below, we affirm in part, and in part reverse and remand with directions.

## II. BACKGROUND

Mary and Curtis were married on May 2, 2003. During their marriage, they had one child, Kasey, born in December 2004. On June 21, 2006, the district court entered a decree of dissolution of marriage. The decree granted Mary care, custody, and control of Kasey, subject to Curtis'

- 1 -

reasonable rights of visitation, established Curtis' child support obligation of $550 per month, and set forth the parties' respective obligations for Kasey's health insurance and division of health care and child care expenses.

## 1. MODIFICATIONS

On November 14, 2011, the district court entered an order of modification upon the parties' stipulation. The court granted the parties joint legal and physical custody of Kasey and reduced Curtis' child support obligation to $500 per month based upon a joint custody child support computation. The court adopted the parties' mediated parenting plan, which provided that parties would alternate parenting time on a weekly basis, exchanging Kasey at 7 p.m. on Sundays. Additionally, the court ordered the parties to comply with the terms of their stipulation, which provided that they would evenly divide all unreimbursed medical expenses and all extracurricular activity and "educational related" expenses incurred on Kasey's behalf. On November 21, 2012, the district court again modified the parties' decree upon their stipulation by further reducing Curtis' child support obligation to $257 per month.

On April 26, 2016, Curtis filed a complaint alleging that a material change in circumstances had occurred with respect to custody. Specifically, Curtis alleged that Mary failed to provide a stable and structured home for Kasey; that residing 50 percent of the time in Mary's care was no longer in Kasey's best interests; that Mary had not properly cared for Kasey's mental, physical, and educational well-being; and that Mary refused to comply with the terms of the modified decree. Mary filed an answer and countercomplaint denying most of the allegations in Curtis' complaint and alleging that a material change in circumstances warranted an increase in Curtis' child support obligation. Curtis filed an answer to Mary's countercomplaint, generally denying its allegations.

Curtis filed a motion for examination under Neb. Ct. R. Disc. § 6-335 (rev. 2008), requesting that the court require Mary to submit to a drug and alcohol screen. The district court entered an order for testing, directing both Mary and Curtis to submit to a screening for alcohol and drug use through both urine and hair-follicle sample testing. Neither Mary nor Curtis tested positive for illegal substances on the tests.

## 2. TRIAL

Trial was held on August 22, 2017.

### (a) Mary's Testimony

Mary has a bachelor's degree in paralegal studies. At the time of trial, Mary had two part-time jobs. She worked caring for a disabled man for 2 hours a day, 5 days a week, earning $9 per hour. Two weeks before trial she acquired a temporary position with a law firm implementing a legal software program. This job required her to work 20 hours a week, earning $15 per hour. Mary was unsure whether her second job would continue for more than 6 months, but felt that it could become a permanent, full-time position. Mary was unemployed from July 2010 until April 2011. In the past 6 years, Mary had been employed by at least 7 entities, including various law firms. Between 2014 and 2017, Mary applied for at least 36 jobs, 25 of which were in 2017. She did not earn enough money to file tax returns in 2015 and 2016.

Mary has been diagnosed with bipolar disorder, adjustment disorder with depressed mood, and Lyme's Disease, which earlier had been misdiagnosed as fibromyalgia. At the time of the 2011 modification, Mary was "sick" and recently had had a pacemaker installed. Also at this time, Mary was under the supervision of the Department of Health and Human Services, who was providing live-in persons to monitor her activity, and she was regularly tested for drug use.

From 2007 until June 2015, Mary and Kasey lived in a home in Lincoln where, at various times, both of her older children, Kinsey and Kash, also lived. Between June 2015 and trial, Mary and Kasey lived with a total of 13 different people at 5 different locations. During this time, Mary was rarely required to pay rent. At the time of trial, Mary was living with her daughter Kinsey, where she had been for 2 months. Before moving in with Kinsey in June 2017, Mary lived with her son, Kash, from October 2015 until June 2017. Kash allowed several of his friends to live with him, Mary, and Kasey during that time. They were evicted from that house because of Kash's failure to pay rent. Before moving in with Kash in October 2015, Mary lived with friends for the month of September 2015. Before this, Mary lived with Kinsey at a different location for the months of July and August 2015.

When asked whether Kash's behavior during the time she lived with him was a good example for Kasey, Mary replied, "I'm not sure I can answer that because I don't think that's a fair question." She admitted that Kash is an alcoholic and has an anger problem. Although Kash never hit Mary, he did damage property inside their rental house when Kasey was not at home. Still, Mary thought that Kash was kind to Kasey and that Kasey should have spent more time with him. Kash never acted out while Kasey was in Mary's care.

Mary testified about an incident with one of Kash's friends who lived with Mary and Kasey for a month. This individual had stolen property, including a shotgun, four golf bags, and some power tools, which he stored in the garage of the home. When Mary discovered the stolen property, she called the police. Mary believed that this individual retaliated by shooting a bullet through her window, which bullet lodged itself in the headboard of her bed. The police could not confirm whether this individual was responsible.

For a couple of years while Mary was living apart from her friends and adult children, her boyfriend, Pat, lived with her. Pat would help Mary with rent when he had a job. Mary agreed that Pat was not a good influence on Kasey. Because of Pat's violence toward her, Mary filed for a protection order against him in May 2014. In her protection order application, Mary stated that Pat had no control of his anger and that she feared he would kill her. Mary indicated that Pat shoved her into the porch, which knocked the breath out of her and injured her elbow. Pat threatened to hit Mary in her son's presence and regularly called her profane names.

Since the entry of the divorce decree, several creditors have sued Mary to recover unpaid bills, and Mary has filed for bankruptcy three times. Mary made attempts to pay some of the expenses related to Kasey's medical bills, his school expenses, and, for a few years, his football registration. Mary contested the expenses for Kasey's recent extracurricular and leisure activities because she was not involved in arranging them. She also stated she was not presented with Curtis' expenses related to Kasey.

Mary accommodated Curtis by allowing Kasey to transfer elementary schools so that he could walk to Curtis' mother's house after school during Curtis' parenting weeks.

Mary testified that she and Kasey have a very close and loving relationship. She was particularly concerned with Kasey's spiritual life. Mary regularly takes him to church, where they together teach a class for third graders. Mary and Kasey also have nightly devotions before bed. Mary has volunteered in his class since he was in preschool. She also watches him with his neighborhood friends, and is actively involved in those friends' lives.

(b) Curtis' Testimony

Curtis testified that he owns an interest in the drywall company that employs him. Between his salary and his share of the company profits, he earned approximately $140,000 in 2012, $156,000 in 2013, $124,000 in 2014, $151,000 in 2015, and $294,000 in 2016. His work hours are flexible, and he often drops off and picks up Kasey and his stepchildren from school. When he is unable to take the children to and from school, the children's grandmothers provide transportation.

When Curtis and Mary were married, he used drugs and drank alcohol in excess. He gave up alcohol and, later, marijuana, because he wanted to set a good example for his son. At the time of the 2011 modification, Curtis was living with his mother in a house that she paid for, and his mother helped him during his parenting time with Kasey.

Since the 2011 modification, Curtis built a six-bedroom house, in part with $90,000 in funds his mother gave him. He lives with his wife Dawn, her two daughters, and, every other week, Kasey. Curtis testified that Kasey "literally has it made" at his house. Kasey has his own bedroom and bathroom to maximize his privacy. Curtis and Kasey have many similar interests, including motorcycles and sports. Curtis has encouraged Kasey to try many different sports, which Kasey has done. Curtis and Kasey together decided baseball and football were the best fits for him.

Curtis pays for all of Kasey's extracurricular fees, sports equipment, medical expenses, and school expenses. The court received Curtis' summary of the expenses he paid for Kasey's care and extracurricular activities between March 29, 2016 and January 1, 2017, which expenses totaled $5,426.46. Although Curtis' mother paid for many of the expenses related to Kasey listed in Curtis' summary, Curtis claimed to have repaid her. Curtis explained that he had not been providing receipts from these expenses to Mary for her reimbursement because he knew she did not have the money to pay them. We further note that the majority of the expenses listed related to football, baseball, guitar lessons, and other leisure activities in which Mary did not enroll Kasey and had little involvement.

Curtis testified that he and Mary were able to make joint decisions about Kasey on some matters, and they attend parent-teacher conferences together. He explained that it was a struggle for them to make other decisions jointly. Curtis specifically mentioned having difficulty making decisions about holidays and about which school Kasey would attend. Curtis accused Mary of demanding him to pay her over $900 before she would allow Kasey to transfer to a different school.

Curtis filed for modification because Mary wanted him to pay more child support and because Mary was not paying for half of Kasey's expenses. He also felt that Kasey needed stability in a home. He did not want Kasey to continue moving from house to house with Mary. He admitted, however, that Kasey had never mentioned to him that he and Mary were moving regularly.

Curtis submitted to the court a modified parenting plan, which granted him sole legal and physical custody and provided that he would have final say in case of a decisionmaking impasse.

Curtis' modified plan provided Mary a "10/4" parenting time schedule. Her parenting time would begin every other Thursday at 4:30 p.m. or the conclusion of school activities, whichever is later, and would conclude the following Monday at 8 a.m. or the commencement of the school day, whichever is earlier. During the summer, the parents would rotate physical custody of Kasey on a weekly basis. Curtis felt his proposed arrangement would provide Kasey the stability he requires during the school year. His proposed parenting plan would not require Mary to pay him child support, and he would not require Mary to pay for any of Kasey's extracurricular activities.

Curtis' proposed parenting plan also included the following safety plan:

**I. MAXIMIZATION OF THE SAFETY OF ALL PARTIES AND THE CHILD**

. . . .

During all periods of visitation, the following safety plan shall be in full force and effect:

A. That during all periods of visitation and/or 24 hours prior to the commencement of visitation, the mother shall not consume any alcoholic beverages or narcotics of any kind, except as prescribed by a physician;

B. That in the event of a relapse during a period of visitation, visitation will end as soon as the child can be transported safely to the father;

C. That if the father believes that the mother is under the influence of alcohol or drugs at the commencement of visitation, or at anytime [sic] during a period of visitation, father may suspend or terminate that visitation period until the mother's sobriety can be confirmed.

### (c) Kasey's Testimony

Kasey, who was 12 years old at the time of trial, testified in chambers with the judge and the parties' attorneys present. A record was made and sealed. The court informed Kasey that his testimony would not be shared with his parents, and the court directed the attorneys not to discuss Kasey's testimony with their clients. As a result, we will not recount it here, but we have read and considered Kasey's testimony in our de novo review of the record.

### (d) Other Witnesses

Kinsey, Mary's daughter, testified that she is 27 years old and works as an office assistant for a heating and air company. She, her boyfriend, her 9-year-old daughter, Mary, and, every other week, Kasey live in a four-bedroom duplex. Although Kinsey was encouraging her mother to find a place of her own, she stated that her mother was welcome to stay with her as long as she needs to be there. Kinsey was close to her mother and Kasey, and Kinsey's daughter and Kasey behave like brother and sister. She felt her home was safe. Kinsey observed that Mary is dedicated to Kasey performing well in school and stated that her mother influenced her to value education. She admitted that throughout her childhood her mother struggled with substance abuse and they moved around a lot. Her mother's boyfriends, including Curtis, often treated her and Kash badly. Kinsey felt her mother was a better role model today than she was during her childhood.

Dawn, Curtis' current wife, testified that she works as a judicial assistant for the Nebraska Workers' Compensation Court. She and her daughters live with Curtis, and her younger daughter attends the same school as Kasey. Dawn felt that Kasey got along well with her daughters.

### 3. DISTRICT COURT ORDER

The district court entered an order on December 27, 2017. With regard to legal custody, the court stated:

> It is not necessary to change the joint legal custody provision of the Decree as modified on November 14, 2011, except to avoid disputes the Court finds that in the event that there is an impasse, and the parties are unable to make a joint decision relating to a major issue in Casey's [sic] life, that [Curtis] shall have the final say in those matters.

The court awarded Curtis sole physical custody and found that Curtis' proposed parenting plan was in Kasey's best interests and incorporated it into the modification order, except as to legal custody as set forth above. The district court terminated Curtis' child support obligation, effective September 30, 2017, and ordered Mary to pay $10 per month as a nominal amount of child support. The court ordered Curtis to carry medical insurance for Kasey and to pay all expenses related to him.

Mary appeals.

## III. ASSIGNMENTS OF ERROR

Mary assigns, consolidated and restated, that the district court erred in (1) finding a material change in circumstances had occurred since the last custody order, (2) modifying the parties' divorce decree to give Curtis sole physical custody of Kasey, (3) modifying the parties' divorce decree to give Curtis final decisionmaking authority, (4) allowing Curtis to unilaterally suspend or terminate her parenting time, (5) failing to increase Curtis' child support obligation, and (6) failing to attach a child support calculation to its order of modification.

## IV. STANDARD OF REVIEW

Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and which will be affirmed absent an abuse of discretion by the trial court. *Armknecht v. Armknecht*, 300 Neb. 870, 916 N.W.2d 581 (2018). The same standard applies to the modification of child support. *Id.*

In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Cook v. Cook*, 26 Neb. App. 137, 918 N.W.2d 1 (2018). But when evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Becher v. Becher*, 299 Neb. 206, 908 N.W.2d 12 (2018).

A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018).

## V. ANALYSIS

### 1. MATERIAL CHANGE IN CIRCUMSTANCES

Mary assigns that the district court erred in finding a material change in circumstances occurred since the entry of the last order. The district court did not make an explicit finding that a material change in circumstances affecting Kasey's best interests occurred; rather, the court found that Curtis' parenting plan, providing for Curtis to have physical custody of Kasey subject to Mary's specified parenting time, "appears to be in the best interests" of Kasey. In our de novo review, we conclude that the record does not support a finding that a material change in circumstances occurred to warrant modification of Kasey's physical custody.

Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Whilde v. Whilde*, 298 Neb. 473, 904 N.W.2d 695 (2017). First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. Next, the party seeking modification must prove that changing the child's custody is in the child's best interests. *State on behalf of Slingsby v. Slingsby*, 25 Neb. App. 239, 903 N.W.2d 491 (2017). A material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Kenner v. Battershaw*, 24 Neb. App. 58, 876 N.W.2d 409 (2016).

Curtis does not allege that Mary is an unfit parent, and the record does not contain evidence to that effect. Thus, our inquiry is limited to whether a material change in circumstances has occurred that affects Kasey's best interests. As Curtis framed the issue in his complaint, we examine the record for evidence that since the 2011 modification, Mary has failed to provide Kasey with a stable and structured home and with proper care, has refused to comply with the terms of the modification order, and that it is no longer in Kasey's best interest to reside with Mary 50 percent of the time.

At the time of the divorce decree, Mary and Curtis were both frequent users of alcohol and drugs. Curtis was able to overcome his alcohol and drug use soon after the decree was entered, whereas Mary continued to struggle at least until the time of the 2011 modification. At the time of the 2011 modification, both Mary and Curtis required support from others to live and care for Kasey. Curtis found that support from his mother, who lived with him, helped him take care of Kasey when he had parenting time, and provided financial support. Mary relied upon assistance from the Department to supervise her care of her children.

By the time of this trial, Curtis had become financially successful. His share of the profits and salary from his drywall company provided substantial income. He built a six-bedroom house where he lives with his current wife and her daughters. Curtis' mother continues to help with Kasey by picking him up from school whenever Curtis cannot. Mary, however, continues to struggle financially. She has been unable to retain consistent, full-time employment, in part due to her health issues. Mary has been unable to pay some expenses related to Kasey, most notably her share of his medical expenses. This financial situation does not appear to be a new phenomenon as Mary admitted to being sued by debtors and filing bankruptcy since the time of the decree, and she had

prior periods of unemployment. In the same way that she did when raising her daughter Kinsey, Mary also continued to have contact with questionable individuals.

Mary argues that frequent changes in employment and housing do not constitute a material change in circumstances. She cites *Watkins v. Watkins*, 285 Neb. 693, 829 N.W.2d 643 (2013), *disapproved on other grounds, Hopkins v. Hopkins*, 294 Neb. 417, 883 N.W.2d 363 (2016); *Heistand v. Heistand*, 267 Neb. 300, 673 N.W.2d 541 (2004); *Tremain v. Tremain*, 264 Neb. 328, 646 N.W.2d 661 (2002); and *Hoins v. Hoins*, 7 Neb. App. 564, 584 N.W.2d 480 (1998). In each of these cases the appellate court did not view a custodial parent's frequent moves or changes in employment as a material change of circumstances affecting the best interests of the child. In *Heistand, supra*; *Tremain, supra*; and *Hoins, supra*, the district court's finding of a material change in circumstances was reversed on appeal.

The *Hoins* case is most similar to the present circumstances. The divorce decree in that case granted custody of the couple's daughter to the mother, subject to the father's parenting time. In the seven years following the entry of the decree, the mother moved at least three times and had live-in relationships with three different men, one of whom had a teenage son. The daughter transitioned schools twice. After the mother suffered injuries in a car accident that made her unable to care for the daughter, the daughter moved in with the father for 9 weeks. The father filed an application to modify the divorce decree, alleging a substantial change in circumstances had occurred since the entry of the dissolution decree. Specifically, the father alleged that the mother's moves and changing boyfriends were a poor example for the daughter. The district court entered an order modifying the decree to award custody to the father. We reversed, finding that the father failed to produce any evidence showing that the mother's frequent moves and relationships had a negative effect on the daughter. *Hoins, supra*.

While Mary's instability in housing and employment is a concern, we agree that it does not form the basis for a finding of a material change in circumstances since the entry of the 2011 modification order. Since the time of the initial decree, Mary has struggled to maintain consistent employment and has experienced financial difficulty. She has continued to suffer health issues that have contributed to her ongoing inability to maintain employment. These difficulties existed at the time of the 2011 modification. Thus, nothing has changed with respect to Mary's financial instability in any material way since the parties last agreed to share joint legal and physical custody. Although Mary has moved more frequently since the 2011 modification, there is nothing in the record to suggest these moves have had any negative impact on Kasey.

As a part of the 2011 modification order, Mary was required to share certain expenses for Kasey, which she has failed to do. This failure is due in large part to her precarious financial position, which, again, is not a new situation since the last modification order. Further, Curtis has been the parent to sign Kasey up for his extracurricular activities, and Curtis did not seek contribution from Mary for these or other expenses relating to Kasey until shortly before trial. Thus, Mary's failure to share in expenses for Kasey does not amount to a material change in circumstances.

The remaining area of concern found in the record relates to questionable individuals that have resided, or been present, in the various households that Mary has lived in. Mary admitted that some of these individuals may have been poor role models for Kasey. However, there was no

evidence presented to show that the presence of these individuals in the homes that Mary was staying had any actual negative impact on Kasey.

We acknowledge that appellate courts review custody decisions for an abuse of discretion and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See *Becher v. Becher*, 299 Neb. 206, 908 N.W.2d 12 (2018). Nevertheless, from our review of the record, we conclude that Curtis has failed to sustain his burden of showing that a material change in circumstances affecting Kasey's best interest has occurred since the 2011 modification such that the joint custody arrangement should be changed. Although Curtis' lifestyle since the last modification has resulted in greater stability than Mary's, he did not plead that as a change in circumstances; and in our de novo review, Curtis' improved lifestyle does not amount to a material change in circumstances warranting a change from joint physical custody. The record shows that Mary has continued to provide for Kasey's emotional and education needs despite her inability to remain consistently employed or keep stable housing. Our conclusion also takes into consideration Kasey's in-chamber testimony as well as Curtis' admission that he filed his modification complaint, in part, in response to Mary's request for more child support. We reverse the court's order awarding Curtis physical custody of Kasey and remand with directions to dismiss Curtis' complaint for modification of decree with respect to physical custody and to order that the provisions of the 2011 modification order regarding joint physical custody remain in effect.

## 2. FINAL DECISIONMAKING AUTHORITY

Mary assigns that the district court erred in awarding Curtis final decisionmaking authority over Kasey in the event of a decisionmaking impasse. The district court found that it was not necessary to change the joint legal custody provision of the 2011 modification order, except "that to avoid disputes in the event there is an impasse, and the parties are unable to make a joint decision related to a major issue in Kasey's life, that Curtis would have final say in those matters." Although the court did not explicitly couch its order in these terms, we read the court's order as finding a material change in circumstances regarding the decisionmaking provision of the 2011 modification order. Paragraph D of the mediated parenting plan adopted by the court in that order, entitled "Decision-Making" provided:

> The parents agree that they will share joint legal custody of Kasey discussing and mutually agreeing upon major decisions regarding, but not limited to: Kasey's: education, non-emergency health care, religious upbringing, participation in extra-curricular activities, special needs that may arise, and choice of non-emergency daycare or babysitter.

The record in the instant action support's the district court's finding that the relationship between Mary and Curtis has, for the most part, been cordial and that they do communicate and discuss items regarding Kasey. Although Curtis testified that he and Mary were able to communicate well about some things, he provided examples of their inability to make joint decisions about Kasey. Of particular concern to the district court was Curtis' testimony that Mary demanded over $900 from him before she would allow Kasey to transfer elementary schools. The court also noted the evidence that Curtis has, in essence, been making the decisions relating to

Kasey since the entry of the last order, including what extracurricular activities he is involved in, getting him to medical appointments, and deciding what schools he will attend.

We conclude that the district court did not abuse its discretion in modifying the decisionmaking paragraph of the mediated parenting plan approved by the 2011 modification order to add the following sentence: "To avoid disputes in the event that there is an impasse, and the parties are unable to make a joint decision relating to a major issue in Kasey's life, Curtis shall have the final say in those matters." The remaining terms of the mediated parenting plan approved by the 2011 modification order shall continue to be in effect.

### 3. SAFETY PLAN

Mary assigns that the district court erred in including in the parenting plan a safety plan that allows Curtis to unilaterally suspend or terminate her parenting time. The district court incorporated Curtis' proposed parenting plan in its order, including paragraph I, which we set forth in the background section above. Because we are reversing the court's order of modification, with the exception of the decisionmaking provision noted above, the parenting plan incorporated into the order is no longer in effect. Nevertheless, for the sake of completeness, we find that modification of the 2011 order to include the safety plan was an abuse of discretion.

A trial court has an independent responsibility to determine questions of custody and parenting time of minor children according to their best interests. *Cook v. Cook*, 26 Neb. App. 137, 918 N.W.2d 1 (2018). That responsibility cannot be controlled by an agreement or stipulation of the parties themselves or by third parties. See *Schmeidler v. Schmeidler*, 25 Neb. App. 802, 912 N.W.2d 278 (2018).

In *Schmeidler, supra*, the district court included a provision in the parenting plan that allowed the mother to unilaterally terminate the father's parenting time if she learned that he had been drinking alcohol. The safety plan also allowed the mother to request that the father perform a breath test if she suspected that he has been consuming alcohol during his parenting time. If the father tested positive at the beginning of the parenting time, he would forfeit that parenting time. And if he tested positive at the end of his parenting time, he forfeited his next scheduled parenting time. Finally, if the father had an alcohol-related criminal offense, the safety plan provided that his parenting time would be suspended, unless his parents supervised the parenting time, until the mother and father reached a further agreement for the reinstatement of parenting time or further order of the court. On appeal, we found that the district court's safety plan impermissibly delegated the court's independent responsibility to determine issues of custody and parenting time to the mother

Here, Subsection C of the safety plan allows Curtis to terminate Mary's parenting time if he believes that she is under the influence of alcohol or drugs when the parenting time begins or at any point during her parenting time. As in *Schmeidler*, this provision is an improper delegation of the court's responsibility.

Subsections A and B of the safety plan limit Mary's ability to consume alcohol 24 hours before and during her parenting time. Although Mary struggled with substance abuse earlier in her life, the record contains no evidence that she currently struggles with alcohol dependency or narcotic drug use. Notably, she tested negative for illegal substances using both urinalysis and hair follicle tests. Thus, the record does not support a showing that there has been a material change in

circumstances warranting such a safety provision. If anything, the record shows that Mary's struggle with substance abuse has improved since the 2011 modification order. The district court's inclusion of the safety provision was an abuse of discretion.

### 4. FAILURE TO INCREASE CHILD SUPPORT OBLIGATION

Mary assigns that the district court erred in failing to increase Curtis' child support obligation to reflect his substantial income and their joint physical custody arrangement. In her countercomplaint, Mary alleged that a material change in circumstances warranted an increase in Curtis' child support obligation. Because the court modified Kasey's custody from joint physical custody to sole custody with Curtis, it did not address Mary's countercomplaint. Rather, the court terminated Curtis' child support obligation to Mary effective September 30, 2017, and ordered Mary to pay the sum of $10 per month as a nominal amount of child support. Because we are reversing the district court's modification of physical custody, we remand to the district court for further consideration of Mary's countercomplaint.

### 5. FAILURE TO ATTACH CHILD SUPPORT CALCULATION

Last, Mary assigns that the district court erred in failing to attach a child support calculation to its order of modification. Because we are remanding to the district court for consideration of Mary's countercomplaint, we need not address this assigned error.

### VI. CONCLUSION

Following a de novo review of the record, we conclude that the record did not demonstrate a material change in circumstances affecting Kasey's best interests, and the district court abused its discretion in modifying the joint physical custody award in the 2011 modification order. The district court also abused its discretion by incorporating the safety plan provisions in the parenting plan. In these regards, we reverse the district court's order and the incorporated parenting plan. We affirm the order to the extent it modified the decisionmaking provision of the mediated parenting plan incorporated in the 2011 modification order to provide Curtis with final say in the event of an impasse. We remand the cause to the district court for a determination of Mary's countercomplaint for an increase in child support.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.

- 11 -