Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/14/2018 09:08 AM CDT

Deena M. Cook, appellee, v.
Joshua J. Cook, appellant.
___ N.W.2d ___

Filed July 31, 2018.    No. A-17-480.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees.

2. **Evidence: Appeal and Error.** In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue.

3. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

4. **Child Custody: Visitation: Courts.** A trial court has an independent responsibility to determine questions of custody and visitation of minor children according to their best interests, which responsibility cannot be controlled by an agreement or stipulation of the parties.

5. **Divorce: Child Custody: Evidence.** If the court disapproves of a custody stipulation, it must give the parties an opportunity to present evidence relevant to a complete reexamination of the question of custody.

6. **Divorce: Child Custody.** Personal observations by the court are not sufficient to support an award of custody in a dissolution proceeding in the absence of evidence establishing the best interests of the child.

7. ____: ____. A court is required to review a parenting plan and determine if it meets the requirements of the Parenting Act and if it is in the best interests of the minor child or children.

8. \_\_\_\_: \_\_\_\_. If a parenting plan lacks any of the elements required by the Parenting Act or is not in the child's best interests, the court shall modify and approve the parenting plan as modified, reject the parenting plan and order the parties to develop a new parenting plan, or reject the parenting plan and create a parenting plan that meets all the required elements and is in the best interests of the child.

9. \_\_\_\_: \_\_\_\_. If a court rejects a stipulated parenting plan, it must provide written findings as to why the parenting plan is not in the best interests of the child.

10. **Divorce: Property Division.** Equitable division of property is a three-step process: (1) classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage; (2) value the marital assets and marital liabilities of the parties; and (3) calculate and divide the net marital estate between the parties in accordance with the principles contained in Neb. Rev. Stat. § 42-365 (Reissue 2016).

11. \_\_\_\_: \_\_\_\_. All property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to this general rule.

12. **Antenuptial Agreements: Property Division.** A premarital agreement allows prospective spouses to avoid the application of the general rule that all property accumulated and acquired by either spouse during marriage is part of the marital estate.

13. **Antenuptial Agreements: Proof.** The party opposing enforcement of a premarital agreement has the burden of proving that the agreement is not enforceable.

14. **Antenuptial Agreements.** Nebraska's Uniform Premarital Agreement Act broadly allows prospective spouses to protect their interests during a marriage and in contemplation of a divorce through a premarital agreement.

15. **Antenuptial Agreements: Property Division.** Nebraska's Uniform Premarital Agreement Act specifically allows prospective spouses to create premarital agreements providing that property acquired by each of the parties during the marriage, which by definition includes income separately earned, is to be his or her separate property.

16. **Property Division.** A marital debt is one incurred during the marriage and before the date of separation by either spouse or both spouses for the joint benefit of the parties.

Appeal from the District Court for Custer County: KARIN L. NOAKES, Judge. Affirmed in part as modified, and in part reversed and remanded for further proceedings.

Nathan T. Bruner, of Bruner Frank, L.L.C., for appellant.

Michael S. Borders, of Borders Law Office, for appellee.

Moore, Chief Judge, and Arterburn and Welch, Judges.

Moore, Chief Judge.

## I. INTRODUCTION

The marriage of Deena M. Cook and Joshua J. Cook was dissolved by a decree of the district court for Custer County. Before the marriage, Joshua and Deena signed a premarital agreement that provided for separate ownership of their present or future property. They also submitted a stipulated parenting plan that provided the parties would share joint final say in certain parenting decisions regarding their children. The district court found certain agricultural assets and a joint operating debt to be part of the marital estate. The court also altered the stipulated parenting plan, giving Deena final decisionmaking authority over the children. On appeal, Joshua challenges these findings as contrary to the respective agreements. For the foregoing reasons, we affirm in part as modified and in part reverse, and remand for further proceedings.

## II. BACKGROUND

Before Joshua and Deena were married on September 5, 2009, they signed a premarital agreement that defined and valued both parties' premarital property. The attached schedules to the premarital agreement show that Joshua owned real estate, pickup trucks, a horse, a "[t]racker," a stock trailer, a saddle, and guns and that he had real estate debt. Joshua's amortization schedules also included two cows. Deena's schedule showed that she owned a vehicle and a gun collection and that she had a vehicle loan. The agreement also included the following provision:

### 3. SEPARATE OWNERSHIP OF PROPERTIES

It is understood and agreed by each of the parties hereto that each party will retain full and complete

ownership of all real and personal property that they now own, and shall retain full and complete ownership of all property which shall come into their possession as the result of each party's work and labor, investments, inheritance or otherwise. No property now owned or hereinafter acquired by either party shall be considered marital or jointly owned property unless said property is specifically transferred into a joint or survivorship account by mutual consent of the parties. Each party shall continue to manage and operate their own investments and business interests, and the other party shall take no action which would be detrimental to the business or investments of the other, and shall make no claim of a right to use, or inherit said property, whether now owned or hereinafter acquired. Each party agrees to execute any documents necessary to allow the other to conduct their business affairs, so long as the execution of such documents do [sic] not adversely impact the party being asked to sign such document. If either party desires to sell, transfer or otherwise convey his or her separate property, the other shall join in the deed of conveyance or other instrument as may be necessary to make the same effectual.

On August 19, 2015, Deena filed a complaint for dissolution of marriage. Joshua filed an answer and countercomplaint for dissolution of marriage, requesting, among other things, that the court divide the parties' assets in compliance with their premarital agreement. The parties filed a stipulated parenting plan on January 5, 2017, which plan provided that Deena would have physical custody of the parties' two minor children, subject to Joshua's parenting time. In the plan, Joshua and Deena agreed to share joint legal custody of the children and to share joint final say in the choices regarding the children's education, religious upbringing, and medical needs.

Trial was held on February 28, 2017. The court admitted the parties' stipulated parenting plan into evidence. Neither Joshua

nor Deena presented evidence concerning custody, parenting time, decisionmaking, or the ability of the parties to communicate on issues pertaining to the children. The parties did present evidence, however, about the enforceability and interpretation of their premarital agreement. Although Deena initially argued the premarital agreement was unenforceable, she eventually stipulated at trial to its validity and enforceability. Still, Deena argued that the agreement did not apply to various property, including a house, a "40 × 40 [b]uilding," and agricultural assets Joshua used to produce income.

The parties submitted a joint property statement to the court, which listed the parties' assets and debts, each party's estimation of the value of each asset or debt, and each party's claim regarding whether the asset or debt was separate or marital property. The listed assets relevant to this appeal were a cow, item G1; corn, item G2; "[c]ash [r]ent," item G3; and 30 head of yearling steers, item G4. Deena valued item G1 at $900, item G2 at $35,000, item G3 at $4,225, and item G4 at $45,000 based on the values assigned to them in a balance sheet prepared for Bruning State Bank in 2015. Joshua listed no values for these items, instead claiming them as his separate property. Also listed on the joint property statement as item I1 was a secured debt from the Bank of Broken Bow, which each party claimed to be marital and valued at $27,000. At trial, Joshua and Deena stipulated that this debt corresponds to the corn, item G2.

A loan officer at the Broken Bow branch of Bruning State Bank, also known as Bank of Broken Bow, testified that Joshua and Deena have an operating loan with his bank. The court admitted into evidence the loan note, which both Joshua and Deena signed. The operating loan is a line of credit that Joshua uses to fund his agricultural operation. To maintain the loan, the bank required Joshua and Deena to file a balance sheet of their assets and debts each year. The balance sheets contained property belonging to both Joshua and Deena. Although the loan officer had not researched the values the parties assigned

to equipment or real estate in the balance sheet, he verified the values assigned to corn, feed, and cattle using local market prices. The court admitted into evidence two of those balance sheets, the first dated July 6, 2015, and the second dated June 24, 2014. Deena's signature appeared on the June 2014 balance sheet but not on the July 2015 balance sheet. The loan officer indicated the discrepancy was a clerical error. The court also admitted the transaction history for this line of credit into evidence, which showed the loan had an outstanding balance of $27,000 at the time Deena filed for divorce.

Deena testified about the extent and value of the property she claimed to be marital, specifically stating that items G1 through G4 were not included by name in the premarital agreement. She noted that item G4, the 30 head of yearling steers, must have been purchased during the marriage because they were not listed on Bruning State Bank's June 2014 balance sheet. Deena admitted that, consistent with their premarital agreement, she and Joshua kept their finances separate during their marriage, having separate bank accounts, vehicles, and, with some exceptions, debts. At the time of trial, Deena had been employed for 5 years and was earning an annual salary of $40,100. Deena's employment provides health and dental insurance for the family, as well as a retirement account. Deena deposited her earnings into her separate bank account.

Joshua testified that he farms, ranches, and drives a truck for a living and that he custom farms corn and raises cattle on leased ground. Joshua further testified that he attempts to sell the corn and cattle at the high points of their respective markets, although each year's corn crop and yearling steers are grown or raised and sold in the same year. He subleases some of his rental land, but does not charge his sublessees more for the land than he pays to rent it. Joshua's 2015 tax return does not reflect any rental income, and he could not explain the $4,225 in cash rent shown as an asset on Bruning State Bank's July 2015 balance sheet. The balance sheet includes cash rent of $6,500 as a current liability. Joshua uses

his separate bank accounts for his farming, ranching, and trucking operations. The court admitted bank statements for Joshua's separate accounts into evidence, which demonstrate that Joshua deposited the income from his various operations into those accounts.

At the conclusion of evidence, the trial court expressed the following concerns with the premarital agreement:

I'm just going to point out to the parties my concern with the language in the Prenuptial Agreement in section three where it says, shall retain full and complete ownership of all property which shall come into their possession as the result of each party's work and labor. You know, typically I've upheld prenuptial agreements where it is income-produced [sic] on premarital property that remains separate. But, this appears as though it's too broad to be allowed. The result of each party's work and labor typically goes into a marital estate . . . . So, anyway, that wording concerns me that that may not be equitable.

The court filed the decree in April 2017. The decree recited that the parties submitted a stipulated parenting plan, which the court found to be fair, reasonable, and in the best interests of the minor children. The court awarded the parties joint legal custody of the children and awarded Deena the primary care, custody, and control of the children subject to the parenting plan. The court then stated:

The parenting plan (Exhibit 24) is approved and ordered **EXCEPT that the mother shall have the final say in decisions regarding the children upon which the parties cannot agree**. The court does not approve the portion of the plan under the Parenting Responsibilities and Cooperation section that states the parents shall have the "joint final say in the choices regarding the children's education, religious upbringing and medical needs" and the parties are not ordered to comply with that provision. The parties are ordered to comply with the remaining terms of the parenting plan.

The decree further acknowledged that the parties stipulated to the premarital agreement's validity and enforceability. It explained, "The findings and orders hereinafter made incorporate such stipulations insofar as they go, and the Court determines the other issues upon the evidence presented." The court found various property and debts to be nonmarital or separate property under the premarital agreement. The court awarded to Deena as her separate property two bank accounts, a life insurance policy, and a retirement account. And to Joshua as his separate property, the court awarded a 2006 Chevy Silverado pickup, a 2006 Kawasaki, a residence in Custer County, a "40 × 40 [b]uilding," a life insurance policy, and three investment accounts. The court found the mortgage on the residence to be Joshua's nonmarital debt under the premarital agreement. But the court included the property disputed here—items G1, G2, G3, G4, and the debt, item I1—in the marital estate. The court awarded assets to Deena valued at $12,622 and did not assign her any marital debt. The court awarded assets to Joshua, including those presently disputed, with a total value of $137,733, and assigned him the $27,000 operating debt, resulting in a net marital estate of $110,733. To equalize the marital estate, the court awarded Deena a judgment of $49,056.

Joshua appeals.

### III. ASSIGNMENTS OF ERROR

Joshua assigns, restated, that the district court erred in (1) modifying the parties' stipulation contained in the joint parenting plan to give Deena final decisionmaking authority over the children and (2) including items G1, G2, G3, G4, and I1 in the marital estate.

### IV. STANDARD OF REVIEW

[1-3] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge.

*Becher v. Becher*, 299 Neb. 206, 908 N.W.2d 12 (2018). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.* In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. *Connolly v. Connolly*, 299 Neb. 103, 907 N.W.2d 693 (2018). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*.

## V. ANALYSIS

### 1. Parenting Plan

Joshua assigns the district court erred in giving Deena final decisionmaking authority over the children. He argues that because he and Deena agreed to a parenting plan that awarded them joint decisionmaking authority and presented no evidence beyond the stipulated parenting plan, the court could not alter the parties' parenting plan without an evidentiary hearing. He further argues that the court should have included in the decree factual findings about why Joshua and Deena's stipulated parenting plan was not in the best interests of the children. We agree.

### (a) Evidentiary Hearing

Joshua argues that if a court alters a stipulated parenting plan, it must hear evidence concerning the custody arrangement that is in the best interests of the children. He asserts the court erred in altering the plan to award Deena final decisionmaking authority over the children, because the only evidence regarding the parenting plan presented at trial was the testimony of Joshua and Deena that the stipulated parenting plan is in their children's best interests.

[4-6] A trial court has an independent responsibility to determine questions of custody and visitation of minor children according to their best interests, which responsibility cannot be controlled by an agreement or stipulation of the parties. *Becher, supra*. But if the court disapproves of a custody stipulation, it must give the parties an opportunity to present evidence relevant to a complete reexamination of the question of custody. *Zahl v. Zahl*, 273 Neb. 1043, 736 N.W.2d 365 (2007) (citing *Lautenschlager v. Lautenschlager*, 201 Neb. 741, 272 N.W.2d 40 (1978)). Personal observations by the court are not sufficient to support an award of custody in a dissolution proceeding in the absence of evidence establishing the best interests of the child. See *Lautenschlager, supra*.

In *Lautenschlager, supra*, a mother and father agreed by stipulation that the mother should have custody of their child. In the course of the divorce trial, the mother falsely answered a question posed to her. The trial court concluded that because she lied to the court, the mother's character was not conducive for custody. The mother appealed, arguing that the record did not contain sufficient evidence to support the trial court's custody decision. The Nebraska Supreme Court held that when a trial court concludes that a stipulation should not be approved, it must give the parties an opportunity to secure and present evidence relevant to a competent reexamination of the question of custody and the best interests of the child. Because the trial court did not offer that opportunity to the mother, the Nebraska Supreme Court reversed the decree and remanded the custody issue to the trial court for further proceedings.

So too, in *Zahl, supra*, when a mother and father divorced, they each sought sole custody of their child. The parents each submitted evidence to support their claims for sole custody and their different proposed parenting plans. The trial court's dissolution decree did not adopt either party's proposal. Instead, it decreed that the parties would share joint custody, without

discussing the best interests of the child. On appeal, the father challenged the court's ability to enter a joint custody order without allowing the parties to present evidence on that issue. The Nebraska Supreme Court held that under *Lautenschlager, supra*, the trial court was required to give the parties an opportunity to present evidence relevant to a competent reexamination of the question of custody when it disapproved of the plans they submitted.

Here, the parties presented no evidence on child custody other than their testimony that the agreed-upon parenting plan was in their children's best interests. The parties agreed to share joint legal custody of the children. "Joint legal custody" is defined by statute as "mutual authority and responsibility of the parents for making mutual fundamental decisions regarding the child's welfare, including choices regarding education and health." Neb. Rev. Stat. § 43-2922(11) (Reissue 2016). Consistent with this definition, the parties' stipulated parenting plan provided that the parents shall have "the joint final say in the choices regarding the children's education, religious upbringing and medical needs." At no time during the trial did the court inform the parties that it was dissatisfied with this provision. The court offered no opportunity for the parties to present evidence on why they believed the joint final decisionmaking authority to be in the best interests of their children. Under the rule announced in *Lautenschlager* and *Zahl*, the court was required to give the parties due process before altering their stipulated arrangement, and the court's observation of the parties during the dissolution hearing is insufficient to support altering a stipulated parenting plan. See *Lautenschlager, supra*. We find the district court abused its discretion in failing to provide the parties an opportunity to present evidence before altering their stipulated parenting plan as it relates to joint decisionmaking. We, therefore, reverse the portion of the decree granting Deena final decisionmaking authority over the children and remand that issue to the

district court for further proceedings to allow the parties to present evidence on it.

### (b) Written Findings Regarding Why Parenting Plan Was Not in Children's Best Interests

Joshua also argues that when the district court chose to reject a portion of the stipulated parenting plan, under Neb. Rev. Stat. § 43-2923(4) (Reissue 2016), the court was required to provide written findings as to why the stipulated parenting plan was not in the best interests of the children.

[7-9] A court is required to review a parenting plan and determine if it meets the requirements of the Parenting Act and if it is in the best interests of the minor child or children. *Becher v. Becher*, 299 Neb. 206, 908 N.W.2d 12 (2018). If the parenting plan lacks any of the elements required by the act or is not in the child's best interests, the court shall modify and approve the parenting plan as modified, reject the parenting plan and order the parties to develop a new parenting plan, or reject the parenting plan and create a parenting plan that meets all the required elements and is in the best interests of the child. *Id.* See, also, Neb. Rev. Stat. § 43-2935(1) (Reissue 2016). But if the court rejects a parenting plan, it must provide written findings as to why the parenting plan is not in the best interests of the child. *Becher, supra.* See, also, § 43-2923(4).

In *Becher, supra*, the dissolution trial was conducted by a referee whose report included recommended findings of fact related to child custody and a proposed parenting plan. The district court modified the referee's proposed parenting plan. On appeal, the Nebraska Supreme Court found that the district court did not abuse its discretion in modifying the proposed parenting plan, because of its independent responsibility to determine custody and parenting time according to the children's best interests. In reaching this conclusion, the court noted that the district court provided written findings of why

the modification to reduce potential conflicts was in the children's best interests.

In the instant case, beyond the district court's statement that it did not approve of the parties sharing joint decisionmaking authority over their children, the dissolution decree provided no written findings explaining why it rejected and modified this provision in the stipulated parenting plan. Under § 43-2923(4), the district court is required to provide such written findings. Because we are reversing the portion of the decree that rejected the decisionmaking provision in the parenting plan and remanding the issue for further proceedings, we need not address this argument further, other than to point out the statutory obligation of the court.

## 2. Determination of Marital Estate

Joshua assigns that the district court erred in including items G1, G2, G3, G4, and I1 in the marital estate, contrary to the provisions of the premarital agreement. The court enforced the provisions of the premarital agreement with respect to some of the parties' separate property as outlined above. But the court disregarded the premarital agreement with respect to a $900 cow, item G1; $35,000 in corn, item G2; $4,225 in cash rents, item G3; and $45,000 in yearling steers, item G4. Based on this division, it appears the court determined that the premarital agreement applied only to items with a specific title or account name. We disagree with the court's interpretation.

[10] Under Nebraska's divorce statutes, "The purpose of a property division is to distribute the marital assets equitably between the parties." Neb. Rev. Stat. § 42-365 (Reissue 2016). Equitable division of property is a three-step process: (1) classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage; (2) value the marital assets and marital liabilities of the parties; and (3) calculate and divide the net marital estate between the parties in accordance

with the principles contained in § 42-365. See *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017).

[11,12] All property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to this general rule. *Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582 (2017). Thus, income from either party that accumulates during the marriage is a marital asset. *Id*. (citing *Harris v. Harris*, 261 Neb. 75, 621 N.W.2d 491 (2001)). But spouses are able to contract around this general rule using a premarital agreement. See *Strickland v. Omaha Nat. Bank*, 181 Neb. 478, 491, 149 N.W.2d 344, 354 (1967) ("it is the very purpose of an antenuptial contract to exclude the operation of statutory law with respect to the property rights of the parties"), *overruled on other grounds, In re Estate of Stephenson*, 243 Neb. 890, 503 N.W.2d 540 (1993).

[13] Under Nebraska's Uniform Premarital Agreement Act (UPAA), a "[p]remarital agreement" is an agreement between prospective spouses made in contemplation of marriage that is effective upon marriage. Neb. Rev. Stat. § 42-1002(1) (Reissue 2016). The party opposing enforcement of a premarital agreement has the burden of proving that the agreement is not enforceable. *Edwards v. Edwards*, 16 Neb. App. 297, 744 N.W.2d 243 (2008) (citing Neb. Rev. Stat. § 42-1006(1) (Reissue 2016)). Joshua and Deena stipulated that the premarital agreement is valid and enforceable.

[14] The UPAA broadly allows prospective spouses to protect their interests during a marriage and in contemplation of a divorce through a premarital agreement. It provides, in relevant part, as follows:

> (1) Parties to a premarital agreement may contract with respect to:
>
> (a) *The rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located;*
>
> (b) The right to buy, sell, use, transfer, exchange, abandon, lease, consume, expend, assign, create a security

interest in, mortgage, encumber, dispose of, or otherwise manage and control property;

(c) The disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event;

(d) The modification or elimination of spousal support;

(e) The making of a will, trust, or other arrangement, to carry out the provisions of the agreement;

(f) The ownership rights in and disposition of the death benefit from a life insurance policy;

(g) The choice of law governing the construction of the agreement; and

(h) Any other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty.

(Emphasis supplied.) Neb. Rev. Stat. § 42-1004 (Reissue 2016). The act defines property as "an interest, present or future, legal or equitable, vested or contingent, in real or personal property, including income and earnings." § 42-1002(2).

[15] Joshua and Deena's premarital agreement in section 3 specifically provided "each party will retain full and complete ownership of all real and personal property that they now own, and shall retain full and complete ownership of all property which shall come into their possession as the result of each party's work and labor, investments, inheritance or otherwise." Despite the concerns the court voiced at the conclusion of the trial, Nebraska's UPAA specifically allows prospective spouses to create premarital agreements providing that property acquired by each of the parties during the marriage, which by definition includes income separately earned, is to be his or her separate property. See §§ 42-1002(2) and 42-1004(1). Therefore, we find section 3 of Joshua and Deena's premarital agreement to be enforceable under Nebraska's UPAA.

The evidence shows that Joshua acquired items G1, G2, G3, and G4 as the result of his separate farming and ranching

activities and through his individual labor. Joshua placed earnings from the sale of his corn and yearling steers and from subletting land in his separate account. And Joshua and Deena followed the terms of their premarital agreement by keeping their finances separate during marriage. As a result, the cow, corn, yearling steers, and rental income were Joshua's separate property under the premarital agreement.

[16] Both parties labeled item I1, which is a $27,000 debt secured by Joshua's corn, as a marital debt on their joint property statement, and Joshua and Deena owe the debt jointly. A marital debt is one incurred during the marriage and before the date of separation by either spouse or both spouses for the joint benefit of the parties. *McGuire v. McGuire*, 11 Neb. App. 433, 652 N.W.2d 293 (2002). But the record shows that this joint debt was for the benefit of Joshua's separate operations. Joshua and Deena's stipulation at trial connected this debt to Joshua's corn, item G2. Deena presumably executed the loan in compliance with the provision in the premarital agreement to execute any documents necessary to allow Joshua to conduct his business affairs. Thus, also consistent with the agreement, she should not be adversely impacted by signing the loan. And there was no evidence that the parties used Deena's income or money from her separate bank account to make payments on the debt. Because we have determined that the corn is Joshua's separate property pursuant to the premarital agreement, the associated debt likewise should be considered Joshua's separate debt and not included in the marital estate, because the debt is not for the joint benefit of the parties.

We find the district court abused its discretion in including items G1, G2, G3, and G4 in the marital estate. Thus, we modify the decree to exclude those items from the division of the marital estate and to award them to Joshua as his separate property under the premarital agreement. Similarly, we modify the decree to exclude the debt in item I1 from the marital estate and to assign the debt to Joshua as his separate debt under the premarital agreement.

Because we modified the determination of the marital estate, we must recalculate the equalization judgment due to Deena. Neither party has challenged the court's valuation of the marital property, so we use the court's values in calculating the division of the marital estate. The court found Deena's net marital estate to equal $12,622. After removing the disputed assets and debt from the marital estate, Joshua's net marital estate equals $52,608. The difference between the awards is $39,986. To equalize the division, Deena is entitled to a judgment of $19,993. Therefore, we modify the decree to award Deena a judgment in the sum of $19,993, as opposed to $49,056.

## VI. CONCLUSION

We find the district court abused its discretion in altering the parties' stipulated parenting plan without affording the parties an opportunity to present evidence on their ability to make joint decisions concerning the children. We reverse the portion of the decree that altered the parenting plan and remand the cause for further proceedings on this issue. We also find the court abused its discretion in including items G1, G2, G3, G4, and I1 in the marital estate. We modify the classification of the marital estate to provide that these items are Joshua's separate, nonmarital property in accordance with the premarital agreement. As a result, we modify the court's equalization judgment against Joshua to $19,993.

Affirmed in part as modified, and in part reversed and remanded for further proceedings.