IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

KORF V. KORF

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

SARAH KORF, APPELLEE,

V.

JONATHON KORF, APPELLANT.

Filed February 19, 2019.    No. A-18-360.

Appeal from the District Court for Lancaster County: ANDREW R. JACOBSEN, Judge. Affirmed as modified.

Matt Catlett, of Law Office of Matt Catlett, for appellant.

Steffanie J. Garner Kotik, of Kotik & McClure Law, for appellee.

MOORE, Chief Judge, and PIRTLE and ARTERBURN, Judges.

MOORE, Chief Judge.

## I. INTRODUCTION

Jonathon Korf appeals from orders entered by the district court for Lancaster County in the course of a dissolution of marriage action. Jonathon challenges the court's award of temporary child support to his then wife, Sarah Korf, now known as Sarah Rosenau. As to the decree of dissolution, Jonathon challenges the court's award of legal and physical custody to Sarah, its permanent child support award, and its classification and division of marital property. On cross-appeal, Sarah challenges the court's award of parenting time to Jonathon and its classification and division of marital property. As discussed below, we affirm as modified.

## II. BACKGROUND

Jonathon and Sarah were married on July 17, 2009 and had one child, Tegan, a daughter born in 2013. Sarah filed a complaint to dissolve her marriage to Jonathon on April 30, 2015. The

- 1 -

complaint asked the court to award Sarah temporary and permanent custody of Tegan subject to Jonathon's parenting time and to order Jonathon to pay temporary and permanent child support. Sarah filed a motion for temporary custody and child support on July 29, and she mailed a copy of that motion to Jonathon.

Jonathon was served with a summons and a copy of the complaint at his place of employment on August 3, 2015. He filed a timely answer and counterclaim, which listed the address where Sarah mailed her motion for temporary custody and child support as his current address. In his counterclaim, Jonathon asked the court to award him temporary and permanent legal and physical custody of Tegan and to order Sarah to pay child support. Jonathon later amended his answer and counterclaim to seek joint custody in the alternative to sole custody.

1. TEMPORARY ORDERS

The district court held a hearing on Sarah's motion for temporary custody and child support on August 28, 2015. In an order entered on September 11, the court awarded Sarah physical custody of Tegan subject to Jonathon's supervised parenting time on alternating weekends from Saturday at 8 a.m. to 5 p.m. The court also directed Jonathon to pay $544 per month for Tegan's support, which obligation was to begin on September 1.

On September 17, 2015, Jonathon filed a motion to vacate or reconsider the temporary order. The motion alleged that he was entitled to a rehearing on the issues of custody and child support because he was not provided notice of the hearing on Sarah's motion for temporary custody and support hearing "**subsequent** to service of the Summons and a copy of the complaint upon him . . . ." It further alleged that the temporary order was not in Tegan's best interests.

On October 5, 2015, the court entered a temporary order modifying the custody provision of the September 11 temporary order to allow Jonathon unsupervised parenting time on alternating weekends from 8 a.m. on Saturday to 6 p.m. on Sunday. The modified order did not alter Jonathon's child support obligation.

Jonathon filed a motion for additional parenting time on March 18, 2016, alleging that Tegan's best interests required the court to award him additional parenting time. He asked the court to award him, at a minimum, the parenting time schedule appended to the Third Judicial District's Local Rules as appendix form 3. The form provides the non-custodial parent parenting time every other weekend beginning on Thursday at 4:30 p.m. (or the conclusion of school activities, whichever is later) until the following Monday at 8 a.m. (or the commencement of the school day, whichever is earlier).

The court entered an order modifying Jonathon's parenting time on March 29, 2016. It awarded Jonathon parenting time on alternating weekends from Thursday at 5 p.m. to Sunday at 5 p.m. In all other ways, the order reaffirmed the previously entered temporary orders.

Jonathon filed another motion for additional parenting time on January 1, 2017. In this motion, Jonathan again asked the court for the parenting time schedule provided in Appendix Form 3 of the Third Judicial District's local rules. The court denied Jonathon's request.

## 2. TRIAL

Trial was held on April 17 and July 6, 2017. The court heard testimony from Sarah; Jonathon; Rachel Cordes, Jonathon's sister; and Clifford Korf, Jonathon's father.

### (a) Sarah's Testimony

Sarah and Jonathon separated in November 2014 after the police arrested him based on Sarah's allegation that he placed her in a chokehold twice. Sarah obtained protection orders for herself and Tegan against Jonathon at the end of January 2015, which orders expired in January 2016. Because of his behavior, Sarah originally desired Jonathon to have very limited, supervised parenting time with Tegan. From the entry of the protection order to the September 11, 2015, temporary order, Sarah could not remember Jonathon having any significant contact with Tegan. Also, he did not financially contribute to Tegan's care for about the same period.

Sarah testified that Jonathon had violent outbursts throughout their relationship. When they were dating, Jonathon broke his hand punching a window frame. In November 2009, after they were married, he broke holes in a door with his elbow and his foot. Sarah remembered a handful of violent incidents in 2011, which she identified to be the peak of the violence in her relationship with Jonathon. According to Sarah, his violence damaged their house and a jointly-owned car. Every few months, Jonathon's violence would also injure Sarah, giving her small lacerations and leaving red marks on her arms. She never sought medical attention for her injuries from Jonathon's outbursts. Sarah admitted that she had slapped, hit, pushed, and shoved Jonathon, but she could not recall throwing glasses or dishes at him. Before November 2014, Sarah had not called the police on Jonathon. She was afraid that the police would not take her allegations seriously because on most of the nights that Jonathon was violent with her, she had "a couple beers".

Sarah described herself as an alcohol "addict." However, she stopped drinking in December 2015. At the time of trial, she attended three Alcoholics Anonymous meetings each week and she had had a sponsor for at least a year. She admitted to handling Tegan while under the influence of alcohol. Sarah felt that Jonathon also had a drinking problem, although she admitted to having no knowledge of his drinking habits since they were separated. Further, because Jonathon had been living with his siblings and parents, Sarah was somewhat less concerned about his drinking habits.

Although Jonathon was never violent with Tegan, he once threw water on Sarah while she was breastfeeding her. He also once kicked Sarah in the thigh while Tegan was in her arms. Tegan was usually at home during Jonathon's violent outbursts and sometimes was in the same room when the outburst occurred. Sarah feared that Jonathon would become violent with Tegan when she becomes older and more stubborn.

Sarah believed that Jonathon and Tegan loved each other. Before Jonathon and Sarah separated, he was quite involved in Tegan's upbringing. Jonathon stayed home with her when she was sick, took her to her appointments and daycare, bathed her, clothed her, fed her, and changed her diapers. After they separated, Sarah still contacted Jonathon to process her decisions about Tegan with him. Sarah, however, did not inform Jonathon about all of Tegan's medical appointments because she wanted "to go in and get out on her own." She could only specifically remember informing Jonathon about two appointments, both of which he attended. Sarah felt that

she was flexible with Jonathon when he wanted to modify his parenting time, and she allowed Tegan to call her father whenever she wanted.

Sarah requested both sole legal and physical custody subject to Jonathon's parenting time, which she proposed to be every other weekend from 5 p.m. on Thursday to 5 p.m. on Sunday. Because she and Jonathon had difficulty communicating and making joint decisions about Tegan, Sarah did not feel a joint legal or physical custody arrangement would be in Tegan's best interests.

Sarah believed that expanding Jonathon's parenting time to the Third District's suggested schedule would not be in Tegan's best interests. In her opinion, Jonathon's parenting time at the time of trial disrupted Tegan's sleep schedule and caused behavioral issues. Although medical testing showed that Tegan was not intolerant to dairy, Sarah did not allow Tegan to eat food with dairy products in them. Sarah suspected that Jonathon did not follow this restriction because Tegan often returned from Jonathon's parenting time with rashes. Sarah also believed that Jonathon should not receive additional parenting time because he had saved images that she did not care for to a social media account. She admitted, however, that at the time of trial his activity associated with those images was "dormant" and that she had no way of knowing whether he continued to view similar images or whether Tegan had seen him viewing them.

After the parties separated, Sarah had access to Jonathon's income until he rerouted the direct deposit from his employer to another account in February 2015. They had two credit cards during their marriage. At the time they separated, they owed some debt on each card. The statement for one of the cards showed a balance of $6,681.48 on November 19, 2014. Sarah's credit report showed that the other card had a balance of $3,782 in December 2014. By the time of trial Sarah had paid the balance on the first card, and she believed the balance on the second card had been paid.

Sarah had a health savings account (HSA) through her employer-provided health insurance. Sarah's 2016 tax return showed that she received $3,346 in distributions from an HSA, which distributions she used to pay $3,346 in qualified medical expenses. Sarah also had a retirement account through the company that employed her throughout the marriage. The account had a balance of $3,319.24 on the day the parties married and a balance of $34,257.34 on the day they separated.

Sarah generally asked the court to award her and Jonathon the marital property that was in their respective possessions at the time of trial. After she and Jonathon separated, Sarah sold marital property, including a television for $600, a table for $60, and a freezer for $75, to pay their credit card bills and other family expenses. Sarah also withdrew all of the funds from and closed an account that she and Jonathon had created for Tegan's benefit in order to pay family expenses.

Sarah bought a house in Lincoln a few hours before she married Jonathon. She would not have bought the house if she had not married Jonathon, and she considered it to be their marital home. Because Jonathon had been laid off at the time they purchased the house and had significant student loan debt, the bank would not lend to them together. As a result, the house's deed and mortgage were in Sarah's name alone. Sarah's parents gave her $5,000, which she used with some of her other personal funds to assist with the purchase. The court received into evidence a settlement statement from the U.S. Department of Housing and Development for Sarah's loan on the house. The statement showed that the purchase price was $102,500, settlement charges to Sarah

were $3,320.90, Sarah's deposit or earnest money was $500, the principal amount of the loan was $99,243, and with other minor adjustments for tax credit and prorate, the cash amount due from Sarah at closing was $5,296.72.

During the marriage, Jonathon and Sarah made improvements to the house. When Sarah filed her complaint for dissolution, the outstanding principal on the mortgage was $89,102.40, and an appraisal estimated the house's value at that time to be $108,000. Sarah described significant damage to the house, which she attributed to Jonathon's violent outbursts. She asked the court to require Jonathon to pay half of the cost of repairing that damage and to place the house solely in her name.

### (b) Jonathon's Testimony

Jonathon lived with his mother and father in Firth, and he planned to remain there for the foreseeable future. He believed that it would be in Tegan's best interest for the court to award him and Sarah joint custody. Jonathon attended every medical appointment for Tegan before and after her birth. He and Sarah jointly paid for the costs of Tegan's birth. After Tegan was born, Jonathon took 2 to 3 weeks of vacation to help at home. Because Sarah had used all of her paid time off, Jonathon stayed home with Tegan when she was sick and when daycare was closed. Jonathon equally shared the responsibility of caring for Tegan.

At the time of trial, Jonathon continued to drink alcohol socially, but he did not drink at all during his parenting time with Tegan. Although Jonathon consumed alcohol more often and in higher quantities while he was living with Sarah, he felt Sarah drank more at that time than he did. Jonathon drank less after Tegan's birth because of his parental responsibilities. Sarah reduced, but did not discontinue, her alcohol consumption when she was pregnant with Tegan, and she increased her alcohol consumption again after Tegan's birth. Jonathon recalled Sarah drinking so much at a party that she did not know where Tegan was. He admitted, however, that he attended the same party and that he had also lost track of Tegan after drinking too much. Further, he recalled Sarah driving under the influence of alcohol while Tegan was in the car.

Jonathon and Sarah argued frequently. During some of these arguments, they yelled, threw glasses, punched walls, and grabbed phones or cameras from the other person. Their arguments continued after Tegan's birth. Jonathon felt that the domestic violence in his relationship with Sarah was mutual and that he only physically engaged his wife to defend himself and restrain her.

Jonathon was arrested in November 2014 after a domestic dispute with Sarah, and charges were filed against him. The charges were dismissed after Jonathon participated in a diversion program, which required him to attend a men's domestic violence program and counseling as well as perform community service. He felt the domestic violence program and counseling helped him manage his anger. Jonathon continued to participate in counseling after he had completed the diversion program.

Jonathon had little contact with Tegan between November 2014 and September 2015 on account of protection orders that Sarah requested. His contact increased when the court gave him parenting time under its temporary orders. Jonathon exercised all of the parenting time he was allowed under each of those orders. Sarah never allowed him additional parenting time beyond what the temporary order provided.

As Jonathon's parenting time increased, his communication with Sarah also increased. All of the communications were civil and courteous. Sarah attended special events with Jonathon and Tegan after Sarah filed her complaint for dissolution, including holiday dinners and a visit to a water park. Jonathon and Sarah did not argue at any of these events. Jonathon believed that he and Sarah could effectively communicate to jointly raise Tegan.

Jonathon attempted to comply with the restrictions Sarah imposed on Tegan's diet at first. However, he did not continue to follow these restrictions during his parenting time because Tegan was not allergic to the foods Sarah restricted. He felt Sarah's restrictions were an attempt to impair the quality of his parenting time.

Jonathon proposed that the parties would share joint legal and physical custody of Tegan, alternating physical custody weekly. Jonathon's proffered child support worksheets provided that he would pay $571 per month if the court awarded Sarah sole custody and would pay $62 per month if the court awarded joint custody.

In 2015, Sarah filed a separate tax return, and claimed Tegan as a dependent. As a result, Jonathon was also required to file separately without claiming Tegan as a dependent and had a total tax liability of $6,372 in 2015. This occurred again in 2016, resulting in Jonathon having a total tax liability of $3,245 in 2016. He admitted that, in both years, part of his tax liability was due to his status as an independent contractor.

From the time he and Sarah were married until shortly after Sarah filed her complaint for dissolution, Jonathon worked for the same company as Sarah. His retirement account with this company contained $13,174 at the time Sarah filed her complaint.

Jonathon estimated the following values for marital property in either his or Sarah's possession: a bike trailer, $50; a bicycle, $500; a washer and dryer set, $200; a refrigerator/freezer, $750; an PRS electric guitar, $350; a guitar amp, $270; and a convertible crib/bed, $940; and a stainless steel blender, $40. Jonathon also estimated the following values for marital property that Sarah sold without his knowledge: a television, $500; a dining room table, $50; a Blu-ray player, $30; a video game console, $100; a freezer, $50; and a wireless router, $50. Jonathon also testified that Sarah, without his knowledge, withdrew the funds from a joint account that was intended to be a college fund for Tegan. Jonathon's joint property statement showed the account had a balance of $1,069.27 on January 31, 2015.

Jonathon's joint property statement also showed the balances of several of his and Sarah's accounts when Sarah filed her complaint for dissolution. Jonathon had two HSAs with Wahoo State Bank with balances of $400 and $341.77. Sarah also had an HSA at Wahoo State Bank with a balance of $274.29. Jonathon had a checking account at Wells Fargo with a balance of $4,204.35 and a savings account at Union Bank with a balance of $105. Sarah had a checking account with Wells Fargo with a balance of $1,418.27 and account with Cornhusker Bank with a balance $1,000. The statement also showed that Sarah's retirement account had a balance of $37,433.88 on the day she filed her complaint.

(c) Rachel Cordes' Testimony

Cordes, Jonathon's sister, testified that she was living with Jonathon and Sarah in November 2014 when Jonathon was arrested. While she was staying with Jonathon and Sarah,

Cordes thought Jonathon had an appropriate relationship with his daughter. During the pendency of his divorce, Jonathon lived with Cordes and her husband for a year. Cordes observed that Jonathon had a strong bond with Tegan. She had no concerns about Jonathon's ability to parent and would trust him with her own child.

### (d) Clifford Korf's Testimony

Clifford testified that he and his wife live on a 4-acre lot in the country with their son, Jonathon. Jonathon was welcome to stay with Clifford and his wife as long as he wanted. Clifford enjoyed having Jonathon at his home and having frequent contact with Tegan. When Jonathon was home, Jonathon did not ask Clifford or his wife to care for Tegan. Clifford observed Jonathon to have a strong connection with Tegan and that he had been very conscious of Tegan's safety in the time that he has lived with Clifford.

### 3. Decree, Qualified Domestic Relations Order, and Edited Parenting Plan

The district court entered a decree of dissolution on January 17, 2018.

The court awarded Sarah sole legal and physical custody of Tegan, subject to Jonathon's parenting time. Jonathon was awarded parenting time on alternating weekends beginning on Thursday at 4:30 p.m. (or the conclusion of school or school activities, whichever is later) until the following Monday at 8 a.m. (or the commencement of school activities, whoever is earlier). In the off week Jonathon was awarded overnight parenting time on Thursday nights beginning at 4:30 p.m. and ending on Friday at 8 a.m. The court ordered Jonathon to pay Sarah child support of $571 per month.

To account for Jonathon's failure to provide support for Tegan between February and September 2015, the district court awarded Sarah the dependency exemption for Tegan in the year 2017. Thereafter, the court directed the parties to alternate the exemption yearly, with Jonathon receiving the exemption in odd years and Sarah receiving the exemption in even years.

The court found the house Sarah purchased was worth $108,000 and had an outstanding mortgage balance of $89,102.40 on the day Sarah filed her complaint. The court determined the equity in the house was $18,897.60. Subtracting the $5,000 gift from her parents that Sarah used as a down payment, the court found $13,897 of that equity to be marital property.

The court found that the retirement account to which Sarah contributed during her marriage had a balance of $37,433 when Sarah filed her complaint. Subtracting the value of the account at the time the parties were married from that amount, the court found $34,114 of Sarah's retirement account was marital property.

The court awarded Sarah the marital home, the bicycle trailer, bicycle, the washer/dryer set, the refrigerator, and the convertible crib/bed. The court also awarded her the balance of her accounts. The court found the following amounts from those accounts to be marital property: Wells Fargo checking account, $1,418; Cornhusker Bank account, $1,100; her retirement account, $34,114; and Wahoo State Bank HSA, $274. The court awarded Jonathon the stainless steel blender, the electric guitar, and the guitar amp. The court also awarded him the balance of his accounts. The court found the following amounts from those accounts to be marital property: Wells

Fargo checking account, $4,204; Union Bank Savings Account, $105; retirement account, $13,174; and Wahoo State Bank HSAs, $400 and $341.

The court calculated Sarah's net award to be $53,214 and Jonathon's net award to be $18,984. As an equalization judgment, the court directed Sarah to pay Jonathon $17,115 from her retirement account. The court indicated it would provide a separate qualified domestic relations order to facilitate the transfer of funds.

After the court entered its decree, Jonathon filed a motion to alter or amend the judgment, asking the court to enter a qualified domestic relations order and clarify some of the language in its parenting plan. The court entered a qualified domestic relations order on February 23, 2018. On March 5, the court entered an order sustaining the balance of Jonathon's motion with a modified parenting plan.

Jonathon appeals, and Sarah cross-appeals.

## III. ASSIGNMENTS OF ERROR

Jonathon assigns, restated, that the district court erred in (1) ordering him to pay temporary child support at an ex parte hearing, (2) awarding Sarah sole legal and physical custody of Tegan, (3) calculating child support, and (4) classifying and dividing the marital property.

On cross-appeal, Sarah assigns that the district court erred in (1) classifying and dividing the marital property and (2) awarding more parenting time to Jonathon than suggested in the Third Judicial District's local rules.

## IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Cook v. Cook*, 26 Neb. App. 137, 918 N.W.2d 1 (2018). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Becher v. Becher*, 299 Neb. 206, 908 N.W.2d 12 (2018). In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. *Connolly v. Connolly*, 299 Neb. 103, 907 N.W.2d 693 (2018). A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018).

## V. ANALYSIS

### 1. TEMPORARY CHILD SUPPORT

Jonathon assigns that the district court erred in granting Sarah's motion for the temporary child support in an ex parte hearing.

Our record on appeal contains no evidence to support Jonathon's assertion that the August 28, 2015, hearing was conducted without Jonathon's presence. The bill of exceptions presented to us on appeal contains no record of that hearing, and the court's order on the hearing does not name the parties who were present at it. Nevertheless, the record shows that Jonathon had notice of the hearing. The certificate of service on Sarah's motion for temporary custody and child support notes

that the motion was mailed to Jonathon's address on July 29. Thus, the record does not support Jonathon's assertion that the initial temporary hearing was held on an ex parte basis.

Jonathon also asserts that the court should not have issued the temporary order because he received service on her motion for temporary custody and child support before he received service on her complaint. He cites no statute or case requiring notice of a hearing to set temporary child support to be served after a complaint for dissolution, and we have found none. Jonathon was properly served the summons and complaint for dissolution several weeks before the hearing on Sarah's motion for temporary custody and child support, and he received notice of that hearing in the mail.

Finally, even assuming the initial hearing was held on an ex parte basis, Jonathon filed a motion to vacate or reconsider the temporary order and was successful in obtaining modification of the initial temporary order as it related to parenting time. And the child support set at the temporary hearing was the same as that set after the final hearing.

We find this assignment of error to be without merit.

## 2. CUSTODY

Jonathon assigns that the district court erred in failing to award him joint legal and physical custody of Tegan. As discussed below, we disagree.

When custody of a minor child is an issue in a proceeding to dissolve the marriage of the child's parents, child custody is determined by parental fitness and the children's best interests. See *Schmeidler v. Schmeidler*, 25 Neb. App. 802, 912 N.W.2d 278 (2018). When both parents are found to be fit, the inquiry for the court is the best interests of the children. *Id.*

In determining the best interests of the child in a custody determination, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing; (2) the desires and wishes of the minor child if of an age of comprehension regardless of chronological age, when such desires and wishes are based on sound reasoning; (3) the general health, welfare, and social behavior of the minor child; and (4) credible evidence of abuse inflicted on any family or household member. Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy educational needs of the child. *Rommers v. Rommers*, 22 Neb. App. 606, 858 N.W.2d 607 (2014). See, also, Neb. Rev. Stat. § 43-2923 (Reissue 2016).

The Nebraska Supreme Court has held that joint physical custody should be reserved for those cases where, in the judgment of the trial court, the parents are of such maturity that the arrangement will not operate to allow the child to manipulate the parents or confuse the child's sense of direction, and will provide a stable atmosphere for the child to adjust, rather than perpetuating turmoil or custodial wars. *Erin W. v. Charissa W.*, 297 Neb. 143, 897 N.W.2d 858 (2017). See, also, *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017); *Zahl v. Zahl*, 273 Neb. 1043, 736 N.W.2d 365 (2007).

Both Sarah and Jonathon contributed substantially to Tegan's parenting before they separated. Both appear to have good relationships with Tegan and care for her well-being. Nevertheless, before they separated, Jonathon and Sarah's conduct around their daughter was less than ideal.

The record shows that both parties consumed alcohol, on occasion to excess, during their marriage in Tegan's presence. Sarah described herself as an alcohol addict. Similarly, the record shows that both parties had difficulty containing their anger during their marriage, and each party engaged in abusive behavior. However, Jonathon was particularly violent, and his outbursts eventually led to his arrest. In the same vein, both parties have received help. Sarah voluntarily attended meetings with Alcoholic Anonymous and has a sponsor. Jonathon participated in a court-sanctioned diversion program involving domestic violence and counseling. Both report their conditions have improved.

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Fales v. Fales*, 25 Neb. App. 868, 914 N.W.2d 478 (2018). Where neither parent can be described as unfit in a legal sense but neither can be described as an ideal parent, appellate courts give particular weight to the fact that the trial court saw and heard the witnesses in making necessary findings as to the best interests and welfare of the children. See *Davidson v. Davidson*, 254 Neb. 357, 576 N.W.2d 779 (1998).

Sarah and Jonathon's history of immaturity and conflict suggests a joint arrangement would be inappropriate. After the district court heard the evidence, it implicitly determined that awarding Sarah sole legal and physical custody would be in Tegan's best interests. Based on our de novo review of the record, we cannot say this determination is an abuse of discretion.

### 3. PARENTING TIME

On cross-appeal, Sarah assigns that the district court erred in awarding Jonathon overnight parenting time on Thursdays during the weeks that he does not have weekend parenting time. She argues that Thursday overnight parenting time is not included in the local rules of the Third Judicial District. This argument is without merit.

Rules of Dist. Ct. of Third Jud. Dist. 3-9 (rev. 2013), regarding parenting plans, states in relevant part: "Appendix Form 3 is a parenting time schedule which, absent evidence otherwise, the court finds provides reasonable parenting time for the noncustodial parent in cases in which the parties are unable to agree otherwise." We view this provision to simply suggest what reasonable parenting time should be, unless there is evidence to show that more, or less, parenting time is appropriate.

The trial court has discretion to set a reasonable parenting time schedule. *Thompson v. Thompson*, 24 Neb. App. 349, 887 N.W.2d 52 (2016). The determination of reasonableness is to be made on a case-by-case basis. *Schmeidler v. Schmeidler*, 25 Neb. App. 802, 912 N.W.2d 278 (2018). Thus, the district court here was not required to award only the parenting time suggested by Third Judicial District's local rules.

Parenting time relates to continuing and fostering the normal parental relationship of the noncustodial parent. *Id.* The best interests of the children are the primary and paramount considerations in determining and modifying parenting time. See *Schriner v. Schriner*, 25 Neb. App. 165, 903 N.W.2d 691 (2017). In this case, the record demonstrated that Jonathon has a strong relationship with Tegan. Tegan's best interests require her to have as much contact with each parent as possible. As a result, the district court did not abuse its discretion in awarding Jonathon an overnight parenting time on weeks that he does not receive weekend parenting time.

### 4. CHILD SUPPORT

Jonathon assigns that the district court erred in its child support calculation. He argues only that his child support obligation should be based on sharing joint physical custody. Because we found above that the district court did not err in awarding Sarah sole legal and physical custody, Jonathon's assignment is without merit.

### 5. CLASSIFICATION AND DIVISION OF MARITAL PROPERTY

Jonathon and Sarah both assign that the district court erred in its classification and division of marital property. As discussed below, after a de novo review of the record, we find the court's classification and division of marital property was not an abuse of discretion.

Under Nebraska's divorce statutes, "[t]he purpose of a property division is to distribute the marital assets equitably between the parties." Neb. Rev. Stat. § 42-365 (Reissue 2016). Equitable division of property is a three-step process: (1) classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage; (2) value the marital assets and marital liabilities of the parties; and (3) calculate and divide the net marital estate between the parties in accordance with the principles contained in equitable distribution statute. *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017).

All property accumulated and acquired by either spouse during the marriage, including marital debts, is part of the marital estate. *Bergmeier v. Bergmeier*, 296 Neb. 440, 894 N.W.2d 266 (2017). Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property. *Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017). Further, as a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Osantowski, supra*.

With these standards in mind, we turn to the specific properties that Jonathon and Sarah argue the district court incorrectly classified and divided.

#### (a) House

First, Jonathon argues that the district court incorrectly calculated the equity in Sarah's house that was marital property. He asserts that the court should have only subtracted the settlement charges and the deposit or earnest money listed on the settlement statement. We agree.

In determining the nonmarital interest in the marital home, Sarah is entitled to receive credit only for those items that contributed to the equity in the house, which in this instance is the difference between the purchase price and the principal amount of the mortgage, or the sum of

$3,257. We thus modify the decree to find that Sarah's nonmarital credit in the home is $3,257 and accordingly, the marital equity in the home is $15,640. The decree is modified to provide that Sarah's equalization payment to Jonathon is $17,986.50.

On cross-appeal, Sarah argues that the district court erred in failing to account for the damage Jonathon caused to the house during his violent outbursts. She asserts that the damage, together with his failure to provide support between February 2015 and September 2015, should reduce the equalization payment she was ordered to pay Jonathon. We disagree.

Although Jonathon caused damage to the house during the marriage, he also contributed to its maintenance and improvement. Both parties equally contributed to the mortgage payments during the marriage. The appraisal of the house showed that it had a value of $108,000 on the day Sarah filed her complaint, which value the court used to determine the equity in the house. Further, the record contained evidence that at least some of the damage to the house was caused by Sarah's violent outbursts. Finally, there was no evidence adduced about the cost to repair the damage to the house. As a result, we cannot conclude the district court abused its discretion when it failed to consider the cost of repairs in dividing the marital estate.

### (b) Sold Marital Property and HSA Withdrawal

Jonathon argues that the district court erred in failing to account for the marital property Sarah unilaterally sold and her $3,346 withdrawal from an HSA in 2016. He asserts the court should add the value of the sold property and Sarah's HSA to her marital assets. As discussed below, we find this argument to be without merit.

Sarah testified at trial that she used the proceeds from the sale of the marital property to pay marital expenses. She paid off over $6,000 in credit card debt that had accumulated during the marriage, which debt appeared to be marital. *Cook v. Cook*, 26 Neb. App. 137, 152, 918 N.W.2d 1, 12 (2018) ("[a] marital debt is one incurred during the marriage and before the date of separation by either spouse or both spouses for the joint benefit of the parties"). The record contained no evidence that she spent those funds on nonmarital expenses. Therefore, the record shows that Sarah did not dissipate marital property, and Jonathon's argument that those the value of that property should be added to her marital assets fails.

Jonathon's argument that Sarah dissipated funds contained within an HSA also fails. Although Sarah's tax return from 2016 does show that she received $3,346 in distributions from her HSA, it also reflects that she used those funds for qualified medical expenses, which according to I.R.C. § 223(d)(2)(A) (2018), only includes medical care for Sarah, her spouse, and her dependents. Further, the court found based on Jonathon's joint property statement that Sarah had only $274 in her HSA when she filed her complaint for dissolution. As a result, Jonathon's argument that the court should add $3,346 to Sarah's marital assets to account for the distribution she received from her HSA is without merit.

### (c) Tax Benefit

Jonathon argues that the district court erred in failing to account for his tax liabilities of $6,372 and $3,245 in the years 2015 and 2016 respectively. He asserts Sarah's choice to file a separate tax return and claim Tegan as a dependent without consulting him caused him to incur

- 12 -

this tax liability. While this may be partially true, the record also shows that Jonathon's status as an independent contractor contributed to his tax liabilities in both years. Further, Jonathon failed to contribute to the payment of marital debts and Tegan's support from February 2015 to September 2015, and thereafter, Sarah was still the primary provider for Tegan. As a result, we cannot conclude the district court abused its discretion when it did not consider Jonathon's tax liabilities in its classification and division of marital property.

### (d) Equalization Judgment

Sarah also generally argues that the equalization payment the court ordered her to pay Jonathon was inequitable. She asserts that failure to contribute to the payment of marital debts and Tegan's support from February 2015 to September 2015 demonstrates that Jonathon had already received an equitable portion of the marital estate. We disagree.

The court awarded Sarah the dependency exemption for Tegan for the year 2017 to compensate for Jonathon's failure to provide support for 6 months in 2015. Thus, the court specifically considered Jonathon's failure to provide financial support to Tegan, and accounted for it in its order. Further, as we discussed above, Sarah received a tax benefit in the years 2015 and 2016, and she was able to pay for the marital debts and maintain the house by selling marital property and using jointly held accounts. As a result, we cannot say the district court abused its discretion in ordering Sarah to pay an equalization judgment to Jonathon.

### VI. CONCLUSION

The district court did not abuse its discretion in ordering Jonathon to pay temporary child support to Sarah. The court also did not abuse its discretion in awarding sole legal and physical custody to Sarah, in its calculation of child support that Jonathon is to pay to Sarah, and in its classification and division of marital property, with the exception of the amount of the nonmarital credit in the family home given to Sarah. Therefore, we affirm the order of the district court as modified above.

AFFIRMED AS MODIFIED.