IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

REINMUTH V. REINMUTH

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JUSTIN L. REINMUTH, APPELLANT,

V.

ALYSSA K. REINMUTH, APPELLEE.

Filed December 10, 2019.    No. A-18-1042.

Appeal from the District Court for Scotts Bluff County: ANDREA D. MILLER and DEREK C. WEIMER, Judges. Affirmed.

Sterling T. Huff, Attorney at Law, P.C., L.L.O. for appellant.

Lindsay R. Snyder, of Douglas, Kelly, Ostdiek, Snyder, Ossian, Vogl, and Snyder, P.C., for appellee.

MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

MOORE, Chief Judge.

INTRODUCTION

Justin L. Reinmuth appeals from the order of the district court for Scotts Bluff County dissolving his marriage to Alyssa K. Reinmuth. On appeal, he assigns error to certain temporary and pretrial orders, the decision allowing Alyssa to file a late counterclaim shortly before trial, certain evidentiary rulings, the award of joint legal and physical custody, the court's determination of child support, and the court's determination of the marital estate. For the reasons set forth herein, we affirm.

BACKGROUND

*Parties.*

Justin and Alyssa were married in 2007. A son was born to the parties in 2012. Alyssa has a daughter from a prior relationship, born in 2004, who was subsequently adopted by Justin. We have referred to these two children individually herein as "the parties' son" and "the parties' daughter," respectively, and collectively as "the parties' children." Justin also had children prior to the parties' marriage, an older daughter who is no longer a minor and a second daughter (almost the same age as the parties' daughter) who resided with the parties but who is not affected by the custody and child support proceedings at issue. We refer to her herein as "Justin's daughter" and discuss her only as necessary to our discussion of issues affecting the parties' children. Justin and Alyssa separated in June 2017.

*Pleadings*.

On June 8, 2017, Justin filed a complaint in the district court, seeking dissolution of his marriage to Alyssa. In addition to a division of the marital estate, Justin sought both temporary and permanent sole legal and physical custody of the parties' children.

Alyssa did not file an answer and counterclaim until July 9, 2018. In it, she requested joint legal and physical custody of the parties' children. Also, on that same date, Justin filed a motion to strike and motion for judgment on the pleadings. On July 17, Alyssa filed a motion to file the answer and counterclaim out of time. On July 24, the district court entered an order granting Alyssa's motion, denying Justin's motion, and allowing Justin "the appropriate period of time to respond," which he subsequently did. In his reply, Justin specifically denied Alyssa's assertion that the parties were fit and proper persons to have joint legal and physical custody of the parties' children.

*Temporary Proceedings*.

On June 8, 2017, Justin filed a motion for ex parte temporary custody of the parties' children pursuant to Neb. Rev. Stat. § 42-357 (Reissue 2016). He also requested an order temporarily excluding Alyssa from the marital residence. The district court granted Justin's motion on that same date, granting Justin sole temporary custody of the parties' children and ordering Alyssa's temporary exclusion from the residence with the order to remain in effect until the motion for temporary custody could be heard by the court.

On June 12, 2017, Justin filed an amended motion for temporary orders, requesting among other things, temporary legal and physical custody of the parties' children with temporary parenting time for Alyssa and temporary child support. At the hearing on Justin's motion, the district court received various affidavits, including affidavits from Justin, Justin's daughter, Alyssa, and Alyssa's friend Eli Arellano. In his affidavit, Justin generally detailed the discovery by his daughter and the parties' daughter of Alyssa's marijuana use and her extramarital affair and his concerns about these issues. In her affidavit, Alyssa admitted that the "marijuana, lotion, and pipe" turned over to law enforcement in June by Justin were hers, but she asserted that they had been purchased in Colorado for use in relieving her back pain and had never been used around any

of the children. She also admitted to having a relationship with Arellano, but she asserted none of the children had met Arellano and that she had not discussed the relationship in their presence. In her affidavit, Alyssa requested joint legal and physical custody of the parties' children.

On June 19, 2017, the district court entered an order awarding Justin temporary legal and physical custody of the parties' children. The court awarded Alyssa parenting time every other weekend from 6 p.m. on Friday until 6 p.m. Sunday and during the weeks when she did not have weekend parenting time from 6 p.m. Tuesday until 8 a.m. Thursday. The court ordered Alyssa to pay temporary child support of $1,048 per month and excluded her from the marital residence.

On July 13, 2017, Justin filed a motion seeking modification of the temporary orders. He alleged that since the entry of the previous order there had been a material change in circumstances in that Alyssa had sent him numerous text messages threatening to harm herself and commit suicide. He stated that his attorney had sent a letter to Alyssa's attorney to inform her that her parenting time was being suspended until the matter could be addressed by the district court. Justin asked the court to require a reasonable form of supervision by a third party during Alyssa's parenting time, reduce her parenting time to accommodate the supervision, and require her to participate in and complete a mental health evaluation, including a drug and alcohol evaluation, pursuant to Neb. Ct. R. Disc. § 6-335.

On July 28, 2017, the district court heard Justin's motion as well as a motion to enforce parenting time (not contained in our record) filed by Alyssa. The court again received the various affidavits offered by the parties. Issues raised in these affidavits, in addition to Alyssa's suicide threats and the issues raised at the previous hearing, included issues with the behavior of the parties' son during parenting time exchanges, the sexual relationship of the parties' daughter and an "eighteen plus year old" while at a church camp, and other behavioral issues with the parties' daughter. In his affidavit, Justin indicated that he had scheduled an appointment for the parties' daughter with an individual counselor and that he intended to visit with the counselor to develop a plan to address parenting time transitions for the parties' son as well. We note that one of the affidavits included attached discovery responses in which Alyssa denied that she was willing to grant Justin sole legal or physical custody of the parties' children but admitted that she would be willing to share joint legal custody. In her affidavit, Alyssa admitted that she had sent Justin text messages insinuating that she might engage in self-harming behavior. She stated that while doing so had been "very immature" of her, the messages were the result of her frustration with Justin due to parenting time issues.

On August 3, 2017, the district court entered an order denying Justin's request to have Alyssa's parenting time with either of the parties' children supervised; however, the court suspended Alyssa's overnight parenting time with the daughter until counseling had commenced and the court had been advised of the progress being made. The court ordered that the daughter be returned to Justin by 10 p.m. on the nights Alyssa had overnight parenting time with the son and that the daughter be returned for parenting time with Alyssa at 8 a.m. the following morning. The court denied Justin's request for a mental health examination of Alyssa, but it ordered that the parties' children engage in counseling with a licensed mental health practitioner to address issues related to parenting time and custody. Finally, the court ordered the parties to cooperate fully with any law enforcement investigation related to the allegations involving the parties' daughter.

On November 8, 2017, Justin filed another motion to modify the temporary orders. In this motion, he alleged that a "more traditional *Wilson v. Wilson*" parenting time schedule with no overnights would be in the children's best interests in that it would allow both children to participate in parenting time with Alyssa together and "in a more uniform fashion." Justin asked that Alyssa be given parenting time from 9 a.m. to 8 p.m. on Saturday and Sunday every other weekend, with no overnights, and that the midweek parenting time on "the off week" be eliminated. Justin alleged that Alyssa had not cooperated with family counseling regarding the minor children and that it would be "more stable" for the children, the daughter in particular, to not have the school week interrupted.

Alyssa filed two motions in November 2017, a motion asking the court to approve family therapy between her and the parties' children with Tracy Campbell (a different therapist than the one already providing therapy for the children) and a motion to reinstate her overnight visitation with the parties' daughter.

Following an evidentiary hearing, the district entered an order on November 21, 2017. The court found that a new family counselor was necessary, stating the initial counselor "regardless of the reason" had not engaged in family therapy with both parents. The court found that the evidence showed that counseling was "critical to the reestablishment" of the relationship between Alyssa and the parties' children. The court appointed Campbell to perform family therapy, ordered that the parties would have equal access to her for counseling, and ordered the parties to alternate taking the children to their counseling sessions. The court also reinstated Alyssa's overnight parenting time with the parties' daughter so that the children would have the same parenting time schedule. The court stated that the previous temporary order filed June 19 was to be followed in that regard. The court also ordered that Arellano not be present during Alyssa's parenting time, and it ordered Alyssa to submit to a hair follicle drug and alcohol test within 30 days and supply a copy of the results to the court.

Justin filed yet another motion to modify temporary orders on December 12, 2017. He repeated his request for "a more traditional *Wilson v. Wilson*" parenting time schedule for Alyssa with parenting every other weekend, no overnights, and the elimination of any midweek parenting time. He alleged that Alyssa had continued to engage in conduct and to allow the parties' daughter to engage in conduct during recent overnight visits that was detrimental to the children. He stated that due to "safety concerns" he was suspending Alyssa's parenting time until the district court could address his motion. Justin also requested clarification of the district court's November 21 order with respect to the parties' son and asked the court to allow the parties' children to continue individual counseling with the initial counselor, Melissa Bauer-Post. On January 5, 2018, the parties filed a stipulation that Bauer-Post could continue as the children's individual counselor and that they would execute releases for the purpose of allowing Bauer-Post and Campbell to communicate with one another and exchange information as necessary. The court subsequently entered an order approving the stipulation.

Following a hearing on the remaining issues raised in Justin's December 2017 motion, the district court entered an order on January 22, 2018, finding that a new temporary order was not necessary. The court found no evidence to support the allegation that the behaviors of the parties' daughter were the result of Alyssa's parenting time and/or Alyssa's lack of supervision of the

daughter. The court noted that during the hearing, Justin's attorney had admitted that Justin himself had trouble "parenting this out of control child." The court stated, "The parties would be better served to use their energy and efforts at gaining control of their daughter rather than using the situation to hurt each other or collect evidence to help their case." The court stated that the prior November 2017 temporary order would remain in effect.

*Trial.*

Trial was held before the district court on August 2, 6, and 17, 2018. Over the course of 3 days, the parties presented testimony from 16 witnesses and offered numerous documentary exhibits. The bill of exceptions on appeal, not including the portion devoted to temporary and pretrial proceedings, contains over 700 pages of testimony. There was evidence about the parties' income and employment (Justin is a teacher, Alyssa manages a hair salon). Both parties testified about their involvement in parenting their children and their interactions with one another. Both parties presented testimony from numerous witnesses attesting that they are good parents, and many of Justin's witnesses also testified that he is a good teacher. Justin generally disputed the parties' ability to communicate well. Alyssa agreed that various text messages she sent to Justin in the previous year were ill advised, including the one where she threatened suicide. There was evidence about Alyssa's marijuana use and about Alyssa's boyfriend. Evidence was adduced about the parties' issues in parenting their daughter. Alyssa requested joint custody while Justin requested sole custody. The court also received evidence about the marital estate. Given the size of the record, we do not recount the trial evidence further, but we discuss further evidence as necessary in the analysis section below.

*Decree.*

On October 4, 2018, the district court entered a decree of dissolution. The court awarded the parties joint legal and joint physical custody of their children, giving Justin final decisionmaking authority on matters related to education and Alyssa final decisionmaking authority on matters related to health, including mental health. The court wrote a lengthy analysis of the custody issue, which we quote in the analysis section below. The parenting plan attached to the decree set forth a rotating week on/week off parenting time schedule along with a holiday parenting time schedule. It also specified that neither party was to consume alcohol or illegal substances within 24 hours of the start of or during their parenting time and that the children were not to be in the presence of or exposed to persons consuming controlled substances except by prescription. The court ordered Alyssa to pay child support of $213 per month for two children and $208 per month for one child. The court's calculations in this regard were based upon its award of joint custody. Finally, the court determined, valued, and divided the marital estate. In doing so, the court determined that Justin had not met his burden of showing that certain debts listed on the joint property statement (to Pipe Works Plumbing and William David Cauble) were "outstanding marital debts." The court ordered Justin to make a property equalization payment to Alyssa of $8,000.

ASSIGNMENTS OF ERROR

Justin asserts, restated and reordered, that the district court erred in (1) determining Alyssa's temporary parenting time, (2) entering orders for pretrial counseling of the children, (3) failing to order a psychological examination of Alyssa, (4) allowing Alyssa to file a counterclaim nearly a year out of time and immediately before trial, (5) making certain evidentiary rulings at trial, (6) granting joint legal and physical custody, (7) determining child support, and (8) determining and dividing the marital estate.

STANDARD OF REVIEW

Generally, the control of discovery is a matter for judicial discretion, and decisions regarding discovery will be upheld on appeal in the absence of an abuse of discretion. *Lombardo v. Sedlacek*, 299 Neb. 400, 908 N.W.2d 630 (2018). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Salem Grain Co. v. City of Falls City*, 302 Neb. 548, 924 N.W.2d 678 (2019).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by these rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *Salem Grain Co. v. City of Falls City, supra*. The exercise of judicial discretion is implicit in determining the relevance of evidence, and an appellate court will not reverse a trial court's decision regarding relevance absent an abuse of discretion. *Id.*

In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Blank v. Blank*, 303 Neb. 602, 930 N.W.2d 523 (2019). When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

ANALYSIS

*Temporary/Pretrial Proceedings.*

Justin challenges the district court's ruling on certain temporary/pretrial proceedings. Specifically, he asserts that the court erred in determining Alyssa's temporary parenting time, entering orders for pretrial counseling of the children, and failing to order a psychological examination of Alyssa.

First, with respect to temporary parenting time, Justin challenges the district court's August 3, 2017, order, which suspended Alyssa's overnight parenting time with the parties' daughter until counseling had commenced and the court had been advised of progress being made. Justin argues that the court should have removed Alyssa's overnight parenting time for both children. He also argues that the court erred by subsequently reinstating Alyssa's overnight parenting time with the daughter. Generally, an appellate court cannot afford relief to a party from a court's ruling on a temporary order because any issue relating to the temporary order is moot after it is replaced by a

more permanent order. *Mann v. Rich*, 18 Neb. App. 849, 794 N.W.2d 183 (2011). See, also, *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004) (issue of ex parte temporary custody order only relevant from time it was ordered until it was replaced by order determining permanent custody; therefore, issues pertaining to temporary order were moot and did not need to be addressed on appeal). The temporary parenting time orders in this case were replaced by the permanent award in the decree; Justin's arguments with respect to the temporary parenting time orders are moot.

Next, Justin argues that the district court erred "in ordering a new child counselor." Brief for appellant at 44. Presumably, this argument refers to the court's November 21, 2017, appointment of Campbell to provide family therapy, which the court found necessary because the initial counselor (Bauer-Post, who was providing individual therapy to the children) had not engaged in family therapy with both parents. Justin does not argue that he was prejudiced in any way by Campbell's appointment. Nor can we find any such evidence in the record. Campbell did not testify and none of her records were admitted into evidence at trial. Error that does not prejudice a party does not provide grounds for relief on appeal. *Scottsbluff Police Off. Assn. v. City of Scottsbluff*, 282 Neb. 676, 805 N.W.2d 320 (2011).

Finally, Justin argues that the district court should have required Alyssa to complete a mental health examination. He argues further that if the court had ordered such an examination "early on in this action perhaps a lot of . . . Alyssa's subsequent behavior could have been avoided." Brief for appellant at 43. He does not further specify to what "behavior" by Alyssa he is referring.

Neb. Ct. R. Disc. § 6-335(a) provides:

Order for Examination. When the mental or physical condition (including the blood group) of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by one or more physicians, or other persons licensed or certified under the laws to engage in a health profession, or to produce for examination the person in his or her custody or legal control. The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.

Generally, the requirements of "in controversy" and "good cause" contained in § 6-335(a) are not satisfied by mere conclusory allegations of pleadings, but are fulfilled by a movant's affirmative showing that the condition to be verified by the requested examination, physical or mental, is actually controverted and that good cause exists for ordering the examination. *Huber v. Rohrig*, 280 Neb. 868, 791 N.W.2d 590 (2010). To obtain discovery under § 6-335(a), the requisite showing does not require the movant to prove the movant's case on the merits at an evidentiary hearing, but may include a showing by an appropriate affidavit or other suitable information presented to a court whereby the court can perform its function under § 6-335(a). *Huber v. Rohrig, supra*. When requesting a physical or mental examination, a movant's ability or inability to obtain the desired information without the requested examination is relevant to a court's decision whether to order an examination under § 6-335(a). *Huber v. Rohrig, supra*.

On August 3, 2017, the district court denied Justin's request for a mental health examination of Alyssa. This was following a hearing in which the parties submitted various affidavits discussing topics including Alyssa's text messages to Justin threatening suicide and her use of marijuana. These issues were thoroughly explored in the various temporary hearings and again at trial. Justin does not argue that he was denied access to any information relevant to the issues at trial by the court's denial of his discovery motion. We find no abuse of discretion in the court's order denying Justin's request for a mental health examination of Alyssa.

*Late Counterclaim.*

Justin asserts that the district court erred in allowing Alyssa to file a counterclaim nearly a year out of time and immediately before trial. He argues that he was unfairly prejudiced by the court's decision given the trial strategy decisions he had made based on Alyssa's failure to file an answer or any counterclaim. Brief for appellant at 44-45.

Neb. Ct. R. Pldg. § 6-1112(a) provides that "[a] defendant shall serve an answer within 30 days after being served with the summons and complaint or completion of service by publication." However, Neb. Ct. R. Pldg. § 6-1106(b) provides for the enlargement of such period after its expiration as follows:

> When by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged if request therefor is made before the expiration of the period originally prescribed or as extended by a previous order, or (2) upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect. The court may not extend the time for taking any action specified in any statute, except to the extent and under the conditions stated in the statutes.

Justin filed his complaint for dissolution of marriage on June 8, 2017, and Alyssa was served with the complaint and summons on June 9. Alyssa filed her answer and counterclaim asking for joint legal and physical custody of the children on July 9, 2018. Justin filed a motion to strike Alyssa's pleading on the same day. Alyssa then filed a motion to file her answer and counterclaim out of time. At the hearing on the parties' motions, Justin offered an affidavit from his attorney, a copy of the return of service for the summons, and a copy of the complaint. Alyssa offered an affidavit from her attorney that included attached supporting documentation. In his affidavit, Alyssa's attorney asserted that due to his own oversight, an answer and counterclaim had not been timely filed; that in reviewing his files in preparation for trial over the weekend of July 6, he realized the error; and that he then drafted an answer and counterclaim, which he filed on July 9. He asserted that Justin would not be negatively impacted by the late filing given that Justin and his attorney had known since at least June 2017 that Alyssa was going to ask for joint physical and legal custody. Alyssa's attorney attached copies of her June 15, 2017, affidavit wherein she made such a request and her response to interrogatories dated August 11, 2017, where she again requested joint custody. Alyssa's attorney also asserted that Justin's attorney had reviewed

Alyssa's answers to the interrogatories "as they were referenced multiple times in [Alyssa's] deposition on July 16, 2018."

The Nebraska Supreme Court has not defined what "excusable neglect" means in the context of § 6-1106(b)(2) but the Eighth Circuit and other federal courts have stated that the determination of whether neglect is excusable "is an equitable one, taking account of all relevant circumstances." *Chorosevic v. MetLife Choices*, 600 F.3d 934, 946 (8th Cir. 2010). The circumstances relevant to this equitable determination include "the danger of prejudice to the [other party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 395, 113 S. Ct. 1489, 1498, 123 L. Ed. 2d 74 (1993). Federal courts have found that neglect due to a busy schedule is not excusable for purposes of granting an extension of time when a deadline is missed in a civil action. See *Keeton v. Morningstar, Inc.*, 667 F.3d 877 (7th Cir. 2012); *Hawks v. J.P. Morgan Chase Bank*, 591 F.3d 1043, 1048 (8th Cir. 2010).

Here, Alyssa's attorney did not offer a reason for his failure to file a timely answer and counterclaim other than inadvertent oversight of the actual deadline for doing so. The question here is whether Justin was prejudiced by the late filing, and given that it was evident as early June 2017 that Alyssa intended to seek joint custody of the parties' children, we cannot say that the district court abused its discretion in allowing Alyssa to file her late answer and counterclaim. Even if Alyssa had not filed a late answer and counterclaim, a trial court has an independent responsibility to determine questions of custody and parenting time of minor children according to their best interests, which responsibility cannot be controlled by an agreement or stipulation of the parties. See *Cook v. Cook*, 26 Neb. App. 137, 918 N.W.2d 1 (2018). Finally, we note that Justin did not seek a continuance of the trial following the court's allowance of the late answer and counterclaim. Justin's assignment of error fails for the reasons set forth above.

*Evidentiary Rulings.*

Justin asserts that the district court erred in making certain evidentiary rulings at trial. Although he references various evidentiary rulings in the statement of facts section of his brief which he claims were erroneous, he only specifically argues one of those alleged errors in the argument section of his brief. Accordingly, we have only addressed that particular evidentiary ruling. In order to be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *U.S. Pipeline v. Northern Natural Gas Co.*, 303 Neb. 444, 930 N.W.2d 460 (2019).

In discussing the factors relevant to the children's best interests with respect to the award of custody, Justin argues that the district court erroneously refused to receive or hear testimony about exhibit 44, which is a collection of documents and news articles about awards won by Justin and his students. At trial, his attorney argued that this exhibit was relevant to show that Justin was a good teacher and a good father. The court sustained Alyssa's relevance objections to the admission of exhibit 44 and to questions about the details of the projects for which Justin and his students had won awards. However, Justin testified without objection that exhibit 44 included "a congratulatory record for being announced on the House [of Representatives] floor" from the

previous year and some of his awards and recognitions received as part of his employment. He also testified that he taught industrial technology and that and he and his students had won some awards for their projects over the previous couple of years. Numerous other witnesses testified that Justin was a good teacher and a good father.

"Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Neb. Rev. Stat. § 27-401 (Reissue 2016). In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party. *Weyh v. Gottsch*, 303 Neb. 280, 929 N.W.2d 40 (2019). The exclusion of evidence is ordinarily not prejudicial where substantially similar evidence is admitted without objection. *O'Brien v. Cessna Aircraft Co.*, 298 Neb. 109, 903 N.W.2d 432 (2017). Where the information contained in an exhibit is, for the most part, already in evidence from the testimony of witnesses, the exclusion of the exhibit is not prejudicial. *Id.* The record was replete with evidence about Justin's skills as a teacher and a father. To the extent that exhibit 44 and any more detailed testimony about its contents was relevant to the issues before the district court in this case, Justin was not prejudiced by the exclusion.

*Joint Custody.*

Justin asserts that the district court erred in granting joint legal and physical custody. The district court wrote a lengthy analyses of its reasons for awarding joint legal and joint physical custody, incorporating the evidence adduced at trial. It is helpful in our de novo review to include it here.

With respect to the award of joint legal custody, the district court stated:

The parties will have joint legal custody of both minor children with Justin having the final decision on matters related to education and Alyssa having the final decision on matters related to health including mental health. The parties have demonstrated when pushed on the issues that they can and do discuss matters of the utmost importance regarding the children. When [their daughter] was in the behavioral health unit, the parties communicated regarding her care. [The son's] health issues have been discussed and decided between the parties as well. The parties communicated regarding head lice with [the son]. When medical issues arose for the children, Alyssa was the primary parent to answer medical related questions, likewise when educational matters arose for the children, Justin would primarily answer the questions.

The court is well aware that the parties have relayed and demonstrated an inability to effectively communicate with each other. Justin claims he cannot communicate with Alyssa regarding the children, however Justin himself would limit communication with Alyssa. Justin withheld information from Alyssa regarding the children's counseling even after she directly asked him about the counseling, medical appointments for [the parties' daughter], and educational matters for [her]. Alyssa claims she attempts to discuss matters with Justin regarding the children, however[,] those discussions would revert to derogatory comments between [the parties].

When matters were timely discussed between the parties, they have worked together to attempt a resolution. Unfortunately, neither party has demonstrated a willingness to ensure that both parents will be consulted and informed of future medical or educational matters and thus, the [c]ourt is left with forcing the parties to discuss matters as they relate to their children. Joint legal custody will ensure that this discussion takes place between the parties and in the event of further disagreement after discussion, there is a method of resolution in place [in the parenting guidelines attached to the decree] to make a decision. It is hopeful that the parties will put their differences aside and work toward co-parenting their children rather than gaining an advantage in a custody case as has been the situation in the past.

In addressing the award of joint physical custody, the district court stated:

The [c]ourt finds joint physical custody to be in the best interest[s] of the children. [The children] will benefit from regular and continuous blocks of contact with both parents. Justin and Alyssa both desire and wish to be actively involved with the children and were actively involved prior to the dissolution proceedings. The evidence shows that both parties are good parents and enjoy a good relationship with their children.

Justin and Alyssa have both exhibited behaviors which are concerning to this [c]ourt when considering the physical custody of the children. Both parents have put their own needs and desires above that of their children during the pendency of this case which has resulted in the children being placed in the middle of the [parents'] disputes. Rather than working together on resolutions and healing for their children, both parties have continued to create an environment filled with contention. This had a direct impact on both children, particularly [the daughter].

Alyssa's use of marijuana was discussed at length in this case. Alyssa testified she has not used marijuana around her children in the past or during any parenting time. She testified she only uses it now occasionally in Colorado where it is legal when she does not have her children. Her previous use of CBD patches for pain is no longer needed now that she is receiving treatment on her back. While the [c]ourt does not condone the use of illegal substances[,] it does not appear that Alyssa's use is having any impact on her ability to parent the children nor is it being done around the children. Witnesses testified that they have been with Alyssa and the children in her home and have seen no signs of marijuana.

Equally concerning to the [c]ourt, Justin has withheld visits from Alyssa with the children and involved the children in parenting decisions. The [c]ourt questions Justin's ability to promote a healthy relationship between Alyssa and the minor children if granted sole physical custody in this case. The most telling and probably the most troublesome evidence of this comes from Justin himself when he testified that Alyssa would get no additional time with the children outside the court order. This was evident when Alyssa requested to have [their son] on Thursdays when not working rather than having him attend daycare at a cost to both parties. She was denied this request multiple times and at one point[,] Justin threatened to call the police if she did not take [their son] to daycare. Justin further withheld information about a trip to New York from Alyssa and left the children

with his family rather than allowing or offering additional time with [Alyssa]. When reviewing [the exhibit containing the parties' text messages], it is clear that his position from the beginning of this divorce was to have extremely limited contact between Alyssa and the children which is not in the children's best interest[s].

In the early months of the separation, Justin would have [the parties' daughter] text her mother from his phone to say she was not going for visits. This set the stage for [the daughter's defiance while at her mother's home early in the divorce. Early transitions for [the parties' son] were difficult when going to and from his parents and Justin did not help the situation by holding on to [him] while he was crying and withholding him for several days from seeing his mother. This type of behavior had a direct impact on the children and their relationship with their mother.

[The daughter's] behaviors were discussed at length in trial. There is no dispute that neither party has a great handle on [her], nor her behaviors. Both parties have installed security systems to keep her in their homes, monitor social media[] access and internet access. As this case progressed, [the daughter's] behaviors progressively worsened to the point where she was on the behavioral health unit. It is clear that she is not thriving under the current court order.

[The parties' son] was discussed at trial on a much smaller scale. Both parents are actively involved with [him] and seem to have a good relationship with him. He has adjusted to the transitions between the parties and goes back and forth between the two households without incident. [The son] enjoys the time he has with both parents.

The court believes that longer, continuous blocks of time with both parents are in [the children's] best interest[s]. This will allow both parties to monitor [the daughter's] behavior while in their custody and make adjustments as needed. It will allow [the daughter] time to adjust to the different parenting styles of each party while in their custody, which in turn will allow each parent to carry out effective discipline with [their daughter] as they see fit. [The daughter] has a decent relationship with both parents and unfortunately is caught in the middle of a nasty divorce.

Justin has made multiple claims that Alyssa cannot properly parent [the parties' daughter] and this [lack of proper parenting] has resulted in [the daughter] sneaking out of the house, contacting boys on social media, smoking marijuana on video, and other types of behaviors. The [c]ourt is quite certain that Alyssa does not condone such behaviors and has taken steps to properly control [the daughter] while in her care. The evidence also shows that [the daughter] exhibited these behaviors while in both parents['] custody. [The daughter] has been caught with cigarettes that are the same brand as Justin [uses], had snuck out of Justin's home, and has received discipline at school on Justin's parenting time.

Justin further claims that he and Alyssa cannot effectively co-parent the children. The testimony showed however that Justin would not consider Alyssa's input on many issues. This would then lead to situations where the parties would argue and fight about the actions taken by Justin. Justin made little effort to include Alyssa in discussions or to co-parent with her in an apparent attempt to retain sole custody of the children in this case.

The district court concluded its discussion of the award of joint custody in this case by stating:

> The [c]ourt having considered all the factors relevant to the best interest of the children finds that joint legal and joint physical custody of the minor children is in their best interest[s]. The joint decision making and continuous blocks of time with the children and their parents will ensure both parents remain actively engaged in the children's upbringing and provides for the children's safety, emotional growth, health, stability, and physical care.

Under the Nebraska Parenting Act, "[j]oint legal custody means mutual authority and responsibility of the parents for making mutual fundamental decisions regarding the child's welfare, including choices regarding education and health." Neb. Rev. Stat. § 43-2922(11) (Reissue 2016). "Joint physical custody means mutual authority and responsibility of the parents regarding the child's place of residence and the exertion of continuous blocks of parenting time by both parents over the child for significant periods of time." § 43-2922(12).

In arguing that that the district court erred in awarding joint and physical custody in this case, Justin relies on prior case law stating that joint custody was not favored and should be reserved for rare cases; however, this case law was recently disapproved of by the Nebraska Supreme Court in *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019), where the Supreme Court stated that a blanket rule disfavoring joint physical custody is inconsistent with the Parenting Act and unnecessarily constrains the discretion of trial judges in some of the most important and difficult decisions they are called upon to make. *State on behalf of Kaaden S. v. Jeffery T., supra.* The Supreme Court stated further that joint physical custody is neither favored nor disfavored under Nebraska law. *Id.* In fact, no custody or parenting time arrangement is either favored or disfavored as a matter of law. The Supreme Court emphasized that in determining custody, a trial court considers the best interests of the child, stating that the Parenting Act authorizes a trial court to award joint custody in dissolution actions if the court specifically finds, after a hearing in open court, that joint physical custody or joint legal custody, or both, is in the best interests of the minor child regardless of any parental agreement or consent. *State on behalf of Kaaden S. v. Jeffery T., supra.*

When determining the best interests of the child in deciding custody, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. *Id.* The Parenting Act provides that the best interests of a child require a parenting plan that provides for a child's safety, emotional growth, health, stability, physical care, and regular school attendance, and which promotes a child's continued contact with his or her families and parents who have shown the ability to act in the child's best interests. *State on behalf of Kaaden S. v. Jeffery T., supra.*

"Parenting time" is defined under the Parenting Act as "communication or time spent between the child and parent or stepparent, the child and a court-appointed guardian, or the child

and another family member or members including stepbrothers or stepsisters." § 43-2922(19). When determining the allocation of parenting time that is in a child's best interests, a trial court should consider the parties' ability to communicate on issues such as transportation, homework, discipline, medical and dental appointments, and extracurricular activities. *State on behalf of Kaaden S. v. Jeffery T., supra*. Other relevant considerations include stability in the child's routine, minimalization of contact and conflict between the parents, and the general nature and health of the individual child. *Id*. The fact that one parent might interfere with the other's relationship with the child is also a factor to consider, but is not a determinative factor. *Id*.

In discussing best interests in the context of child custody and parenting time, the Nebraska Supreme Court stated:

> By reciting these factors, we do not suggest that each will be relevant in every case; nor do we imply that a court is prohibited from considering other factors not mentioned. No single factor is determinative, and different factors may weigh more heavily in the court's analysis depending on the evidence presented in each case. The one constant is that "[i]n any proceeding involving a child, the best interests of the child shall be the standard by which the court adjudicates and establishes . . . any custody, parenting time, visitation, or other access determinations as well as resolution of conflicts affecting each child."

*State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. at 957, 932 N.W.2d at 710.

In this case, as noted by the district court, there were various factors of concern with respect to the award of custody, including the parties' ability to communicate respectfully with one another, their willingness to promote a relationship between the children and the other parent, Alyssa's use of marijuana, and the behavioral issues of the parties' daughter. There was much conflicting evidence, which the district court after seeing and hearing the witnesses and weighing all of the evidence, resolved in favor of an award of joint legal and physical custody. We consider and give weight to the court's determinations in that regard. See *Blank v. Blank*, 303 Neb. 602, 930 N.W.2d 523 (2019). We agree that the parties have been able to resolve issues of major importance relating the children. And, the predictability and consistency of a week on/week off parenting time schedule will eliminate the concerns that arose under the temporary parenting time schedules that included a period of midweek parenting time. The award of joint legal and joint physical custody will reduce the number of parenting exchanges that occurred under the various temporary schedules and minimize conflict, will promote a stable routine for the children, and will help build the relationships between the parties and each of their children. Upon our de novo review, we find no abuse of discretion in the award of joint legal and joint physical custody.

*Child Support.*

Justin asserts that the district court erred in determining child support. Justin's arguments in support of this assignment of error are unclear, and this section of his brief appears to be incomplete. In calculating child support, the court attributed total monthly income to Alyssa of $4,008.25 and to Justin of $4,490.73. The court ordered Alyssa to pay Justin child support of $213 per month for two children and $208 per month for one child. This calculation was based upon the

award of joint physical custody and did not include any amount for previously ordered support or regular support for other children for either party.

Alyssa's 2016 and 2017 W-2 forms were received into evidence at trial and reflect wages of $50,346.86 and $48,098.25, respectively. She testified that her wages for 2018 would continue at the same level as the previous year. Justin's 2016 and 2017 W-2 forms showed wages of $44,099.44 and $35,124.73, respectively. At trial, Justin testified that his pay had decreased in the past year since he had given up coaching after being awarded sole temporary custody of the children. However, he also testified that his current gross monthly pay was $4,490.73; a paystub from May 2018 reflected this amount. The district court sought clarification, asking whether this amount of monthly income would continue for September. Justin replied that his contract with the school ended in August and a new contract would go into effect in September. He testified that he would not know what the new contract entailed until an in-service day subsequent to trial.

Although Justin lists the parties' 2016 and 2017 W-2 wages in his brief, he does not actually argue that the district court erred in using the income figures shown in the child support worksheets attached to the decree. It is clear that the court based Alyssa's income on her 2017 W-2 wages and her testimony that she did not anticipate a change for 2018. It is also clear that the court used Justin's testimony about his current (as of May 2018) gross monthly income to calculate his child support obligation. We find no abuse of discretion in this regard.

As to the substance of Justin's argument, he only states:

> Plaintiff Justin also supports another minor child in his house, [Justin's daughter]. A child support calculation for her has Justin's calculated support at $575.00 per month. When that amount is placed into the support calculator for this action[,] child support payable by defendant Alyssa to plaintiff Justin is: $1,259.00 for two children and $965.00 for one child; [sic] [argument section ends with semi-colon, rather than a period]

Brief for appellant at 42.

Justin appears to be arguing that there should be some credit or deduction to his child support obligation based on the fact that his daughter resides with him full time. The Nebraska Child Support Guidelines allow a deduction for child support previously ordered for other children and a credit, subject to limitations not relevant here, for biological children for whom an obligor provides regular support. Neb. Ct. R. § 4-205(D) and (E) (rev. 2016). Deductions for previously born children have been allowed in determining support for a subsequent child. See, e.g., *Barth v. Barth*, 22 Neb. App. 241, 256-57, 851 N.W.2d 104, 117 (2014). See, also, *Prochaska v. Prochaska*, 6 Neb. App. 302, 305-308, 573 N.W.2d 777, 779-781 (1998). However, in this case, there was no information provided at trial from which such a calculation could be made. Justin testified that his daughter resides with him full time. He did not testify about or provide evidence of any previously ordered support amount for this child, and there is no information in the record about the income of this child's mother or other such information from which Justin's support obligation for her could be calculated. Neither party submitted proposed child support calculations at trial; the court requested the submission of such calculations with the parties' written closing arguments, none of which are part of the trial record. Accordingly, Justin's arguments in this regard must fail.

Finally, to the extent the calculation in Justin's argument is based on his argument that he should have been awarded sole physical custody, we have already determined that the district court did not abuse its discretion in awarding joint physical custody. Accordingly, the court did not abuse its discretion in basing its child support award on a joint custody calculation.

*Division of Marital Estate.*

Justin asserts that the district court erred in determining and dividing the marital estate. He argues that the court erroneously excluded the Pipe Works and Cauble debts from the marital estate and thus erred in ordering him to make a property equalization payment to Alyssa of $8,000.

Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). The first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. *Id.* The second step is to value the marital assets and marital liabilities of the parties. *Id.* The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Dooling v. Dooling, supra*. A marital debt is one incurred during the marriage and before the date of separation by either spouse or both spouses for the joint benefit of the parties. *Cook v. Cook*, 26 Neb. App. 137, 918 N.W.2d 1 (2018).

On the joint property statement, Justin listed a debt to Pipe Works valued at $19,682.20; Alyssa valued this debt at $0. Alyssa believed that this entry on the property statement related to improvements made to the parties' residence by Justin's brother. She did not believe that the amount listed represented an accurate figure for any debt owed, testifying that Justin and his brother "made deals" and exchanged work on each other's houses. The district court received exhibit 76, an invoice from Pipe Works to the parties dated February 1, 2017, and stamped "PAST DUE," totaling $10,182.20. The second page of the exhibit is a bill to Pipe Works from a heating and cooling company for $9,500 marked "PAID" on May 18, 2016. Alyssa disputed the validity of the bills found in exhibit 76, stating that Justin, his brother, and the heating and cooling company "worked out a deal where Justin made furniture and helped with [his brother's] house" and that Justin made a drafting table for someone from the heating and cooling company in exchange for the parties' furnace.

Justin's sister-in-law testified about the Pipe Works debt. She indicated that she and her husband, through their company Pipe Works, "redid the water piping in [the parties'] house," that they had agreed to help the parties financially with this work but that "it was known that they would need to make payments as they could." She testified further that the bill from the heating and cooling company was paid for by Pipe Works because the parties could not afford a new heating and cooling system and that "we would just lump that into the money that [the parties] owed . . . and they would pay us back as they could afford to." She testified that the parties had agreed to make payments on these bills, that no payments had been made as of the date of trial, and that she and her husband did want to be paid back. She denied that the work done on the parties' residence and/or paid for by Pipe Works had been "part of a work trade." She testified that Justin did perform some work for Pipe Works in 2015, but a copy of a W-2 was admitted into evidence to show that Justin had been paid for that work. The W-2 shows wages to Justin from

Pipe Works of $9,760. Justin's sister-in-law agreed on cross-examination that Justin performed some work on the fireplace in her residence, but she testified that he did not get paid for that work. On redirect, she clarified that the work on the fireplace was not "part of a work trade for this $19,000 invoice." The testimony of Justin's brother with respect to the Pipe Works debt was consistent with that of his wife.

Justin confirmed that his brother and sister-in-law's testimony about the parties' agreement to repay them for the work performed on the parties' residence was accurate. When asked if there was any agreement "as to any specific number or annual amount" of repayment with respect to the bills in exhibit 76, he stated, "No. I . . . think what [my brother] actually thought was much like the summer that I had worked for him, that possibly I could go back to work for him to work some of it off," but that because of the divorce he had not "made any payments on it."

Justin valued the Cauble debt at $101,254.81; Alyssa valued it at $0. At trial, Alyssa was unable to explain this debt, testifying that Cauble was Justin's friend. She agreed, however, that she had signed, on August 8, 2015, a document admitted into evidence as exhibit 75. That document provides:

> As a legally binding document between Justin and Alyssa . . . and Cauble . . . exists this agreement.
>
> In September 2010, Justin and Alyssa . . . moved into a rental property . . . owned by . . . Cauble. . . .
>
> For five years Justin and Alyssa . . . rented this property, rent free, and this legally binding agreement is a testament to this fact and is an agreement between [Justin and Alyssa and Cauble] stating this agreement.
>
> As [Justin and Alyssa] are about to purchase this property, this agreement is constructed in the near eventuality of the purchase of the residence . . . if said purchase shall not occur, for any reason, this contract will be considered null and void. That both parties agree that in the case either of the purchasers decides to sell this residence in the future, or move out of said residence, that . . . Cauble be returned the house payments that accrued during the last five years. This may occur through the sale of said property, life insurance proceeds, or future inheritance by either of the purchasers.

The document is dated August 8, 2015, and is signed by Justin, Alyssa, and Cauble. Exhibit 75 also includes a statement of account transactions from a bank over the course of 5 years, starting with a new loan of $101,254.81 in September 2010 and an ending balance of $0 in September 2015. Alyssa agreed that she had signed the agreement contained in exhibit 75 "as a purchaser of that residence," that she was no longer occupying the residence, that the contract was "directly tied to the marital residence," and that if the residence was sold, the contract would operate and "in excess of a hundred thousand dollars" would be owed to Cauble "against the house." The district court received exhibit 75 into evidence but stated, "I don't find it to be very helpful." Alyssa subsequently testified that she was not "aware of" the Cauble debt being "an existing debt right now."

Justin also testified about the Cauble debt and the parties' residence, indicating that the parties began renting the house from Cauble in 2010 and purchased it in 2015. When asked why exhibit 75 was signed, he testified:

> [Cauble] helped us out tremendously by getting the house, helping us get into the house. And I can remember it was a rainy night when we did all of this and she agreed to it. She had said she was an only child and she would get an inheritance one day and we'd be able to pay back some of the debt we accumulated by Cauble helping us out, so she signed it.

Justin testified that figures in the "credit column" portion of the account transactions documentation included in exhibit 75 represented "[t]he payments on the house while [the parties] lived there" and that if the contract were to operate they would be required to "pay all of that back" to Cauble. On cross-examination, Justin was asked whether he anticipated that Alyssa's actions in moving out when the parties separated would "trigger" the repayment provision included in exhibit 75. Justin testified, "I do not know. Cauble is not really on extreme speaking terms with me at this point" because "of all the help he did give us, and we haven't really paid any of it back." When questioned further about whether the terms of the document would be triggered, he stated, "I can't say for sure. He doesn't live in the state anymore," but Justin insisted that Cauble would want some money and would expect "to be paid back in some form or fashion." Justin was asked if the money Cauble wanted back was "the rent that [the parties] didn't pay while [they] lived there," and he testified, "I believe that's what the buildup is, that broke-down sheet." He indicated that there was a "zero balance on that broke-down sheet" because "we bought the house." Justin was also asked whether "the money you paid him paid off his mortgage on the house," to which he replied, "Well yeah. It's a transfer of title."

> In declining to include these two debts in the marital estate, the district court stated:
>
> > Much discussion was given during trial to the [Pipe Works and Cauble debts] on [the property statement]. The [c]ourt finds [Justin] has not met his burden to show the debts are outstanding marital debts. The evidence shows on [Pipe Works] that the work was done by family members, that only one statement was sent (there was no time frame given as to when that was sent) and no payments have been demanded or received. The agreement was vague as to terms of repayment and there is no showing that collection efforts have or will begin between the family members. The court views this as a gift between family and as such will not calculate it in the marital debts when calculating the marital equity. On [Cauble], the evidence showed that there has been no demand for any payment nor that any portion of the agreement would trigger a debt owed.

We agree with the court's assessment of the evidence with respect to both of these debts.

The evidence about these two debts was conflicting and in the case of the Cauble debt, somewhat confusing. After hearing the testimony and observing the witnesses at trial, the district court accepted Alyssa's version of the facts rather than Justin's, and we consider and give weight to that fact. See *Blank v. Blank*, 303 Neb. 602, 930 N.W.2d 523 (2019). The court did not abuse its discretion in excluding the Pipe Works and Cauble debts from the marital estate. Justin's

argument about the equalization payment ordered by the court was based on his assertion that these debts should have been included in the marital estate. Accordingly, that argument fails as well.

## CONCLUSION

Justin's arguments with respect to the temporary parenting time orders are moot. Justin was not prejudiced by the district court's pretrial order appointing Campbell to provide family therapy, so any error in her appointment does not provide grounds for relief on appeal. The court did not abuse its discretion in denying Justin's request for a mental health examination of Alyssa or in allowing Alyssa to file a late answer and counterclaim. At trial, Justin was not prejudiced by the court's exclusion of exhibit 44 or more detailed testimony about its contents. The court did not abuse its discretion in awarding joint legal and physical custody, in its order of child support, or in excluding the Pipe Works and Cauble debts from the marital estate and ordering Justin to make an equalization payment to Alyssa.

AFFIRMED.